[CORPORATIONS.]

THE PRESIDENT, DIRECTORS and COMPANY OF THE BANK
OF THE UNITED STATES, *against* DANDRIDGE and Others.

In a suit brought by the President, Directors and Company of the
Bank of the United States, upon a bond given to the bank to se-
cure the faithful performance of the official duties of one of its
cashiers, *evidence of the execution of the bond, and of its ap-
proval by the board of directors,* (according to the rules and regu-
lations contained in the charter of the bank,) is admissible, not-
withstanding there was no record of such approval ; and the plain-
tiff may prove the fact of such approval by the board, by presump-
tive evidence, in the same manner as such fact might be proved in
the case of private persons, not acting as a corporation, or as the
agents of a corporation.

Where, in such a case, the cashier is duly appointed, and permitted
to act in his office, for a long time, under the sanction of the di-
rectors, it is not necessary that his official bond should be accepted
by the board of directors as *satisfactory,* according to the terms of
the charter, *in order to enable him to enter legally* on the duties of
his office, or to make his sureties responsible for the non-perform-
ance of those duties   The charter and the by-laws are to be con-
sidered, in this respect, as *directory* to the board, and not as *condi-
tions precedent.*

*Feb. 6th and
    7th.*      THIS cause was very elaborately argued by the *Attorney
General* and Mr. *Webster,* for the plaintiffs, and by Mr. *Taze-
well,* for the defendants.   But as the arguments are very fully
stated, and the authorities cited and commented on, in the
opinions of the learned judges, it has not been thought necessary to insert them.

*Feb. 28th.*      Mr. Justice STORY delivered the opinion of the Court:
   This is a writ of error to the Circuit Court for the Dis-
trict of Virginia.   The original action was debt on a bond,
purporting to be signed by Dandridge, as principal, and
Carter B. Page, Wilson Allen, James Brown, Jr., Thomas
Taylor, Harry Heth, and Andrew Stevenson, as his sureties,
and was brought jointly against all the parties.   The condi-

tion of the bond, after reciting that Dandridge had been appointed cashier of the office of discount and deposit of the Bank of the United States at Richmond, Virginia, was, that if he should well, and truly, and faithfully discharge the duties and trust reposed in him as cashier of the said office, then the obligation to be void, otherwise to remain in full force and virtue. The declaration set forth the condition, and assigned various breaches. Dandridge made no defence; and the suit was abated as to Heth by his death. The other defendants severed in their pleas. It is not thought necessary to state the pleadings at large; it is sufficient to state, that Stevenson and Allen pleaded, among other pleas, *non est factum* generally, and also special pleas of *non est factum*, on which issues were joined; and that all the defendants in various forms pleaded, that the instrument was not the deed of Stevenson; and further pleaded, that the bond had never been approved, according to the provisions of the 30th article of the rules and regulations of the bank. Issues were also taken on these pleas; and the cause came on for trial upon all the issues of fact.

At the trial, evidence was offered for the purpose of establishing the due execution of the bond by the defendants, and particularly by Stevenson and Allen, and its approval by the plaintiffs. The evidence was objected to on behalf of the defendants, as not sufficient to be left to the jury, to infer a delivery of the bond, and the acceptance and approval thereof by the directors of the bank, according to the provisions of their charter; and the objection was sustained, the Court being of opinion, that although the scroll affixed by Allen to his name, is in Virginia equivalent to a seal of wax, and although proof of the handwriting of Stevenson, and the bond being in possession of the plaintiffs, and put in suit by them, and the introduction of Dandridge into the office of cashier, and his continuing to act in that office, would, in general, be *prima facie* evidence, to be submitted to the jury, as proof that the bond was fully executed and accepted; yet it was not evidence of that fact, or of the obligation of the bond in this case; because, under the act of Congress, incorporating the Bank of the United States, *the bond ought to be satisfactory to the board of directors, befor*

1827

Bank of the
U. S.
v.
Dandridge.

*the cashier can legally enter on the duties of his office, and consequently before his sureties can be responsible for his non-performance of those duties;* and that the evidence in this case did not prove such acceptance and approbation of the bond, as is required by law for its completion. This opinion constitutes the subject matter of the first bill of exceptions.

Farther evidence was then offered by the plaintiffs for the same purpose, the particulars of which are not now necessary to be enumerated; to which the defendants took various objections, and contended, among other things, that the whole of the evidence, if legal, was not sufficient to go to the jury, upon which to infer the delivery of the paper as the act and deed of the defendants, and its acceptance and approbation by the directors of the bank, pursuant to their charter; which objection was sustained; and the Court excluded the whole, and every part of the said evidence from the jury, being of opinion that the board of directors keep a record of their proceedings, which record, or a copy of it, showing the assent of the directors to this bond, was necessary to show that such assent was given; and *if such assent had not been entered on the record of the proceedings of the said directors, the bond was ineffectual,* and no claim in favour of the plaintiffs could be founded thereon against the defendants in these issues. This opinion of the Court constitutes the subject matter of the second bill of exceptions.

It has become the duty of this Court, upon the present writ of error, to decide whether these opinions of the Circuit Court, or either of them, can be maintained in point of law.

It is material to state, that the rejection of the evidence did not proceed upon the ground that it was of a secondary nature, leaving behind, in the possession of the plaintiffs, evidence of a higher and more satisfactory nature. On the contrary, the whole structure of the case shows, that there was in the understanding of both the parties, no record ever made of the approval or acceptance of the bond in question; and the principal controversy was, whether it could be established by any evidence short of such record proof.

The propositions maintained by the Circuit Court were in substance these. First, that the cashier could not legally enter upon the duties of his office, or make his sureties responsible for his non-performance of those duties, before his official bond was accepted as *satisfactory* by the board of directors, according to the terms of the charter. Secondly, that such acceptance could be established only by proof drawn from the records of the board of directors; and if no record had been kept of such assent and acceptance, the bond was ineffectual, and no secondary evidence could be admitted to establish the fact.

The last proposition will be first considered. The correctness of it in a great measure depends upon the soundness of the distinction taken between the acts of private persons and the acts of corporations. It is admitted in the opinion of the Circuit Court, that the evidence offered would, in common cases between private persons, have been *prima facie* evidence, to be submitted to the jury, as proof that the bond was fully executed and accepted. But it is supposed that a different rule prevails in cases of corporations; that their acts must be established by positive record proofs; and that no presumptions can be made in their favour, of corporate assent or adoption, from other circumstances, though in respect to individuals the same circumstances would be decisive. The doctrine, then, is maintained from the nature of corporations, as distinguished from natural persons; and from the supposed incapacity of the former to do any act not evidenced by writing; and if done, to prove it, except by writing.

Little light can be thrown on this subject by considerations drawn from corporations existing by the common law, or dependent upon prescription. To corporations, however erected, there are said to be certain incidents attached, without any express words or authority for this purpose; such as the power to plead and be impleaded, to purchase and alien, to make a common seal, and to pass by-laws.[a] In ancient times it was held, that corporations aggregate could do nothing but by deed under their common seal,

*margin notes:*
1827.
Bank of the U. S. v. Dandridge.

Distinction as to proof of the acts of corporations and of private persons.

Proof of the acts of aggregate corporations at the common law.

---

[a] *Com. Digest*, Franchise, F. 10. 18.

But this principle must always have been understood with many qualifications; and seems inapplicable to acts and votes passed by such corporations at corporate meetings. It was probably in its origin applied to aggregate corporations at the common law, and limited to such solemn proceedings as were usually evidenced under seal, and to be done by those persons who had the custody of the common seal, and had authority to bind the corporation thereby, as their permanent official agents. Be this as it may, the rule has been broken in upon in a vast variety of cases, in modern times, and cannot now, as a general proposition, be supported. Mr. Justice Bayley, in *Harper v. Charlesworth*, (4 *Barnw. & Cresw.* 575.) said, "A corporation can only *grant* by deed; yet there are many things which a corporation has power to do otherwise than by deed. It may appoint a bailiff, and do other acts of a like nature." And it is now firmly established, both in England and America, that a corporation may be bound by a promise, express or implied, resulting from the acts of its authorized agent, although such authority be only by virtue of a corporate vote, unaccompanied with the corporate seal.

But whatever may be the implied powers of aggregate corporations by the common law, and the modes by which those powers are to be carried into operation, corporations created by statute must depend, both for their powers, and the mode of exercising them, upon the true construction of the statute itself. The doctrine of this Court, in *Head v. The Providence Insurance Company*; (2 *Cranch.* 127.) on this subject, is believed to be entirely correct. It was there said by the Chief Justice, in delivering the opinion of the Court, that "without ascribing to this body, which in its corporate capacity is the mere creature of the act to which it owes its existence, all the qualities and disabilities annexed by the common law to ancient institutions of this sort, it may correctly be said to be precisely what the incorporating act has made it; to derive all its powers from that act, and to be capable of exerting its faculties only in the manner which that act authorizes." In that case, the act of incorporation prescribed the mode in which contracts should be made, in order to bind the corporation, which was not com-

plied with; and the Court held, that there was no binding contract, for the corporation could only act in the manner prescribed by law; and when their agents do not clothe their proceedings with those solemnities which are required by the incorporating act to bind the company, they cannot be deemed as more than proposals or preparatory negotiations. We do not perceive any thing in this doctrine which fairly admits of controversy. But this case has been pressed upon us, at the present argument, as justifying to its full extent the reasoning of the defendants on the present occasion. The question there was not, whether every corporate act must be evidenced by writing; but whether certain acts, which by law were to bind only when done and verified in a particular manner, ought to bind, although those forms were not adopted.

1827.

Bank of the U. S. v. Dandridge.

We do not admit, as a general proposition, that the acts of a corporation, although in all other respects rightly transacted, are invalid, merely from the omission to have them reduced to writing, unless the statute creating it makes such writing indispensable as evidence, or to give them an obligatory force. If the statute imposes such a restriction, it must be obeyed; if it does not, then it remains for those who assert the doctrine to establish it by the principles of the common law, and by decisive authorities. None such have, in our judgment, been produced.

How far the law requires the acts of corporations to be in writing.

By the general rules of evidence, presumptions are continually made in cases of private persons of acts even of the most solemn nature, when those acts are the natural result or necessary accompaniment of other circumstances. In aid of this salutary principle, the law itself, for the purpose of strengthening the infirmity of evidence, and upholding transactions intimately connected with the public peace, and the security of private property, indulges its own presumptions. It presumes that every man, in his private and official character, does his duty, until the contrary is proved;[a] it will presume that all things are rightly done, unless the circumstances of the case overturn this presump

Rules of evidence as to presumptions in the case of private individuals.

[a] See Rex v. Hawkins, 10 *East's Rep.* 211. Powell v. Milbourne. 3 *Wilson*, 355. Hartwell v. Root, 19 *Johns. Rep.* 345.

tion, according to the maxim, *omnia presumuntur rite et so-lemnitur esse acta, donec probetur in contrarium.* Thus, it will presume that a man acting in a public office has been rightly appointed ; that entries found in public books have been made by the proper officer; that, upon proof of title, matters collateral to that title shall be deemed to have been done ; as, for instance, if a grant or feoffment has been declared on, attornment will be intended, and that deeds and grants have been accepted, which are manifestly for the benefit of the party. The books on evidence abound with instances of this kind, and many of them will be found collected in Mr. Starkie's late valuable Treatise on Evidence. (3 *Starkie's Evid.* part iv, 1234. 1241. 1248. and note 1250, &c.)

The same presumptions are, we think, applicable to corporations. Persons acting publicly as officers of the corporation, are to be presumed rightfully in office ; acts done by the corporation, which presuppose the existence of other acts to make them legally operative, are presumptive proofs of the latter. Grants and proceedings beneficial to the corporation are presumed to be accepted ; and slight acts on their part, which can be reasonably accounted for only upon the supposition of such acceptance, are admitted as presumptions of the fact. If officers of the corporation openly exercise a power which presupposes a delegated authority for the purpose, and other corporate acts show that the corporation must have contemplated the legal existence of such authority, the acts of such officers will be deemed rightful, and the delegated authority will be presumed. If a person acts notoriously as cashier of a bank, and is recognised by the directors, or by the corporation, as an existing officer, a regular appointment will be presumed ; and his acts, as cashier, will bind the corporation, although no written proof is or can be adduced of his appointment. In short, we think, that the acts of artificial persons afford the same presumptions as the acts of natural persons. Each affords presumptions, from acts done, of what must have preceded them, as matters of right, or matters of duty.

It may not be without use to advert to a few cases where corporate acts have been the subject of presumptions. In the first place, we may advert to the known fact, that a charter may be presumed to have been given to persons who have long acted as a corporation, and assumed the exercise of the powers of a corporate body, whether of an ordinary or extraordinary nature. This is the case in respect to all corporations existing by presumption. Yet the very case supposes that no written proof can be adduced of a charter, or of a vote of the corporators to accept the charter. Yet, both a charter and acceptance are vital to the existence of the corporation. They are, however, presumed, not merely from the lapse of time, but from the continued exercise of corporate powers, which presuppose their existence. So, in relation to the question of acceptance of a particular charter by an existing corporation, or by corporators already in the exercise of corporate functions, the acts of the corporate officers are admissible evidence from which the fact of acceptance may be inferred. It is not indispensable to show a written instrument or vote of acceptance on the corporation books. It may be inferred from other facts which demonstrate that it must have been accepted. Upon this point it is not necessary to do more than to refer to the general course of reasoning in *The King* v. *Amery*, (1 *Term Rep.* 595. S. C. 2 *Term Rep.* 515.) as applied to the circumstance of that case.[a] In *Wood* v. *Tate*, (5 *Bos. & Pull.* 246.) which was replevin upon a distress made by the bailiff of the borough of Morpeth, for rent, it appeared in evidence that the tenant went into possession under a lease void for not being executed under the corporate seal, even if made by proper officers; yet the Court held, that though the lease was void, the tenant was to be deemed tenant from year to year under the corporation, and his payment of rent from time to time to the officers of the corporation, (though not proved to be by virtue of any written authority) was sufficient proof of tenancy under the corporation, on which the corporation

*a* See also Newling v. Francis, 3 *Term Rep.* 189. Butler v. Palmer, *Salk.* 191.

might distrain for the rent in arrear.  In *Doe* v. *Woodman*, (8 *East's Rep.* 228.) where certain premises had been demised by the plaintiff to the corporation, as tenant from year to year, at an annual rent, though it does not appear in what manner the demise had been accepted, except by the payment of rent by the bailiff, as such, it seems to have been taken for granted that it was proper evidence of a holding by the corporation.  In *Magill* v. *Kauffman*, (4 *Serg. & Rawle*, 317.) which was an ejectment for land claimed by a Presbyterian congregation, before incorporation, under a purchase by their trustees, and after their incorporation claimed in their right as a corporation, the Supreme Court of Pennsylvania held, that evidence of the acts and declarations of the trustees and agents of the corporation, both before and after the incorporation, while transacting the business of the corporation, and also evidence by witnesses of what passed at the meetings of the congregation when assembled on business, were admissible to show their possession of the land, and the extent of their claim of its boundaries.  This must necessarily have proceeded upon the ground that the acts of corporate agents, and even of aggregate bodies corporate or unincorporated, might be established independent of written minutes of their proceedings.

In respect to grants and deeds beneficial to a corporation, there seems to be no particular reason why their assent to, and acceptance of the same, may not be inferred from their acts, as well as in the case of individuals.  Suppose a deed poll granting lands to a corporation, can it be necessary to show that there was an acceptance by the corporation by an assent under seal, if it be a corporation at the common law ; or by a written vote, if the corporation may signify its assent in that manner ?  Why may not its occupation and improvement, and the demise of the land by its agents, be justly admitted, by implication, to establish the fact in favour and for the benefit of the corporation ?  Why should the omission to record the assent, if actually given, deprive the corporation of the property which it gained in virtue of such actual assent ?  The validity of such a grant depends upon the acceptance, not upon the mode, by which

it is proved. It is no implied condition that the corporation shall perpetuate the evidence of its assent in a particular way. At least, if it be so, we think it is incumbent on those who maintain the affirmative, to point out the authorities which sustain it. None such have been cited at the bar. On the contrary, there are highly respectable decisions, made upon great consideration, which assert a different doctrine. The case of the *Proprietors of the Canal Bridge* v. *Gordon*, (1 *Pickering's Rep.* 297.) is directly in point. There the object was to impose an onerous duty, and to discharge or limit the right of toll of the plaintiffs; and the Court held, that the corporation could bind itself, and did in fact, in that case, bind itself to a surrender of its valuable rights, by implications from corporate acts, without vote or deed. The learned Chief Justice of Massachusetts, on that occasion, in delivering the opinion of the Court, said, " it is true that the acts, doings, and declarations of individual members of the corporation, unsanctioned by the body, are not binding upon it; but it is equally true that inferences may be drawn from corporate acts, tending to prove a contract or promise, as well as in the case of an individual; and that a vote is not always necessary to establish such contract or promise. This has been settled in several cases in this country and in England." And afterwards, addressing himself to the facts of that case, he added, " The question, then, is narrowed to this : Have the proprietors of the canal bridge assented to this proposition, and acted under it ? We find no vote to this effect; but we do find that the cross bridge was suffered to unite with theirs, *pursuant to this proposition*, and that for four years all were suffered to pass without toll, who came from Charlestown to Cambridge, or *vice versa*. Now, corporations can be bound by implication as well as individuals, as has been before stated; and no acts could be stronger to show an assent to a proposition, an agreement, or bargain, than those which have been mentioned." Nor was this doctrine new at that time in that Court. It may be clearly inferred from the prior cases of the *President, &c. of the Salem Bank* v. *The President, &c. of the Gloucester Bank*, (17 *Mass. Rep.* 1.) and *Foster* v. *The President, &c. of the Essex*

1827.

Bank of the U. S.
v.
Dandridge.

*Bank,* (17 *Mass. Rep.* 479.) And it has been more recently confirmed in *The Episcopal Charitable Society* v. *The Episcopal Church in Dedham,* (1 *Pick. Rep.* 372.) It may therefore be considered as conclusively settled in Massachusetts. The case of *The Bank of Columbia* v. *Patterson's Adm.* in this Court, (7 *Cranch,* 299.) did not call for any expression of opinion upon the particular point now under consideration; but the Court there held, that from the evidence in that case, the jury might legally infer an express or an implied promise of the corporation. The Court there said, " the contracts were for the exclusive use and benefit of the corporation, and made by their agents for purposes authorized by the charter. The corporation proceed, on the faith of those contracts, to pay money, from time to time, to the intestate. Although, then, an action might have lain against the committee personally, (for the contract was a personal contract by them, under their private seals,) upon their express contract, yet, as the whole benefit resulted to the corporation, it seems to the Court, that from this evidence the jury might legally infer that the corporation had adopted the contracts of the committee, and had voted to pay the whole sum which should become due under the contracts, and that the intestate had accepted their engagement." Here, then, secondary evidence and presumptive proof was admitted in a suit against the corporation to fix its responsibility. A vote of the corporation was presumed from other acts, though there was no proof of such a vote being on record. If the corporation had shown that no such vote had been on record, would the presumption have been completely repelled? Would the omission of the corporation to record its own doings, have prejudiced the rights of the party relying upon the good faith of an actual vote of the corporation? If such omission would not be fatal to the plaintiff in suits against the corporation, (as in our opinion it would not be,) it establishes the fact, that acts of the corporation, not recorded, may be established by parol proofs, and, of course, by presumptive proofs. In reason and justice, there does not seem any solid ground why a corporation may not, in case of the omission of its officers to preserve a written record, give such proofs to support its rights, as would be

admissible in suits against it to support adverse rights. The true question in such case would seem to be, not which party was plaintiff or defendant, but whether the evidence was the best the nature of the case admitted of, and left nothing behind in the possession or control of the party, higher than secondary evidence. The case of *Dunn* v. *St. Andrew's Church,* (14 *Johns. Rep.* 118.) proceeded upon like reasoning. There the plaintiff had performed services as clerk of the church, for the corporation, for which he had received some payments. The records of the corporation contained entries of the payment of moneys, at several times, to the plaintiff, for his services; but no resolution was entered on the minutes or records of the corporation, appointing the plaintiff clerk of the church. The Court held such vote unnecessary to be shown, and that there was sufficient evidence of an implied promise of the corporation to make the compensation. In the *King* v. *Inhabitants of Chipping Norton,* (5 *East's Rep.* 240.) there was a demise by a *verbal* agreement of the corporation, at a court leet, of certain tolls belonging to the corporation. The Court held, that the corporation could *demise* only under *seal,* and that the agreement amounted to a mere license to collect the tolls, though it might be a ground to apply to a Court of equity to enforce it as an equitable interest. The ground there was not that the proceeding being verbal was a nullity, but that it did not operate as a demise of the tenement at law. It was conceded that the verbal agreement bound the corporation as a *license.*

But the present question does not depend upon the point, whether the acts of a corporation may be proved otherwise than by some written document. The reasoning upon it, however, was very ably gone into at the bar, and as it furnishes very strong illustrations upon the point now in judgment, it could not be passed over with propriety.

In the present case, the acts of the corporation itself, done at a corporate meeting, are not in controversy. In corporations existing at the common law and by charter, there are great diversities both of powers and organization. In some corporations the whole powers rest in a select body, or in select bodies, with powers to perpetuate their own corpo-

1827.
Bank of the
U. S
v.
Dandridge.

rate existence, by filling up vacancies in their own body; and such body or bodies constitute the corporation itself, and the meetings and acts done thereat are the meetings and acts of the corporation itself. In short, they constitute the corporation, so far as it has life or organization exclusively. Such are many of the boroughs and other municipal corporations in England, familiarly shown by the name of *quasi* corporations. There are corporations of another sort, where the aggregate body of corporators meet and assemble to discharge corporate functions, and have authority also to perform certain acts and duties, by means of different agents, sometimes designated in the statutes creating them, and sometimes left to their own choice. Of this nature are the townships in New-England, where the inhabitants are corporators, and assemble to exercise corporate powers, and have authority to appoint various officers to perform public duties, under the guidance and direction of the corporation. Such are the selectmen for the ordinary municipal concerns; overseers of the poor, school committees, assessors of taxes, and various other functionaries. In these cases, the various officers form different boards for the performance of different duties, subordinate to the corporation; their acts lawfully done, bind the corporation; but they do not constitute the corporation, nor are their meetings the meetings of the corporation. In the latter cases, the records of the officers are properly records of their own proceedings, and not of the proceedings of the corporation itself.

Nature of the
corporation of
the Bank of
the U. S.

It will be at once seen, upon an inspection of the charter creating the Bank of the United States, that it is not a corporation of the former description. The charter, in the first section, declares, that a bank of the United States of America shall be established, with a capital of 35,000,000 of dollars, of which 7,000,000 shall be subscribed by the United States, and the residue by individuals and corporations. It proceeds to enact, in the 7th section, that the subscribers to the said Bank of the United States, their successors and assigns, shall be and hereby are created a corporation and body politic, by the name and style of " the President, Directors and Company of the Bank of the United States." and by that name shall be capable in law to have.

purchase, receive, &c. lands, &c. goods, chattels and effects, &c. to an amount not exceeding 55,000,000 of dollars, including their capital stock; and the same to sell, grant, &c.; to sue, and be sued, &c.; to make, have, and use a common seal, and to alter the same at pleasure; to ordain, and establish, and put in execution, such by-laws and ordinances as they shall deem necessary and convenient for the government of the said corporation; and generally to do and execute all and singular the acts, matters, and things, which to them it shall or may appertain to do, subject to the other provisions of the act. It proceeds to enact, that for the management of the affairs of the corporation, there shall annually be chosen twenty-five directors by the stockholders; and the board of directors shall appoint a president of the corporation. The directors have further authority given to them to appoint such officers, clerks, and servants, as they shall deem necessary for executing the business of the corporation, and to exercise such other powers and authorities for the well governing and ordering of the officers of the corporation, as shall be prescribed by the laws, regulations, and ordinances of the same. The directors have further authority given them to establish offices of discount and deposit, wheresoever they shall think fit, within the United States, or the territories thereof, and to commit the management of the said offices, and of the business thereof respectively, to such persons, and under such regulations, as they shall deem proper, not being contrary to law or the constitution of the bank; and annually to choose the directors of such offices. Among the rules, which the act prescribes as fundamental articles of the constitution of the corporation, are the following: "that not less than seven directors shall constitute a board for the transaction of business, of whom the president shall always be one, except in case of sickness or necessary absence;" that sixty stockholders, who are proprietors of 1000 shares in the stock, "shall have power at any time to call a general meeting of the stockholders, *for purposes relative to the institution;*" "that each cashier or treasurer, before he enters upon the duties of his office, shall be *required* to give bond, with two or more sureties, to the *satisfaction* of the directors, in a sum not less

than 50,000 dollars; with condition for his good behaviour, and the faithful performance of his duties to the corporation;" that the total amount of the debts of the corporation shall not exceed a limited sum ; and if it does, the directors shall, in their natural and private capacities, be liable to any creditor therefor, with the exception that any director, who shall have been absent when the excess was contracted or created, and who shall have dissented from the resolution or act authorizing it, and shall give notice of the fact in a particular manner, shall be exonerated; that the secretary of the treasury shall be furnished, from time to time, as often as he may require, &c. with statements of the amount of the capital stock, of debts due, of moneys deposited, of notes in circulation, and of specie on hand; and shall have a right to inspect such general accounts of the bank, as shall relate to the said statement.    The act further provides, that a committee of either house of Congress, appointed for that purpose, shall have a right to inspect the books, and to examine into the proceedings of the corporation, and to report whether the provisions of the charter have been violated or not.

Such is a summary of the most important provisions of the act constituting the charter of the bank, and material to the present cause.    It is most manifest that the corporation is altogether a distinct body from the directors, possessing all the general powers and attributes of an aggregate corporation, and entitled to direct and superintend the management of its own property, and the government of the institution, and to enact by-laws for this purpose.    So far as the act delegates authority to the directors, the latter possess it, and may exercise it, not as constituting the corporation itself, but as its express statute agents to act in the ordinary business of the institution.    The directors are created a board, and not a corporate body.    If the authority delegated to them can only be exercised by them when assembled as a board, with a proper quorum, and not by the separate assent of a majority of the whole body, (on which it is unnecessary here to express any opinion,) still it is clear, that their meetings and acts are but the meetings and acts of a board of agents acting *ex officio*, and not the meetings and

acts of the corporation itself. The whole structure of the
charter, and the whole proceedings under it, as well as the
by-laws and regulations which have come under our review,
demonstrate that this has been the uniform construction of
the corporation itself, and of the directors. Indeed, this is
believed to be so universally acted upon in all the cases re-
specting banks, which have been judicially decided, that it
is not thought necessary to do more than express our opi-
nion that such is the true interpretation of this charter.

It is not necessary to consider whether the sixth of the
fundamental articles of the constitution of the bank, which
directs that such cashier or treasurer shall be *required* to
give bond, &c. to the satisfaction of the directors, might
have applied, by its own force, to the cashiers of offices es-
tablished as offices of discount and deposit. In the first
place, that point is not put in the pleadings; in the next
place, the directors are, by the charter, authorized to esta-
blish such offices, subject to such regulations as they shall
deem proper; and, in virtue of that authority, they have
prescribed regulations on this very subject in the 30th article
of the rules and regulations adopted by them for the govern-
ment of such offices, which are set forth at large in the
transcript of the record. The fourth of these articles de-
clares, that the directors of the Bank of the United States
shall appoint the cashiers of the offices of discount and de-
posit; the fifth declares the duties of the cashier, and,
among other things, his duty " to attend all meetings of the
board" of directors of the office, and " to keep a fair and
regular record of its proceedings." The sixteenth directs
that all notes and bills discounted shall be entered in a book
to be called the *credit* book, in such manner as to discover
to the board at one view, on each discount day, the amount
which any person is discounter, or is indebted to the office,
either as payer or endorser. The thirteenth directs, that
" the cashier of each office shall give bond to the President,
Directors and Company of the Bank of the United States,
with two or more *approved* securities, with a condition for
his good behaviour and faithful performance of his duties to
the corporation." By whom the approval is to be made,
whether by the directors of the parent bank, or by the di-

rectors of the office, is not stated.   If the directors of the parent bank might, by the charter, have committed it to the local directors, being found in a system of by-laws for their regulation, it would seem a natural inference that it was their intention to commit it to the latter.   When, as in the fourth rule, they reserve the appointment of the cashier to themselves, the language directly reserves it to " the directors of the Bank of the United States."   If such authority could not, by the charter, be delegated, then it must be deemed to belong to the directors of the parent bank.   It is in the latter point of view that it has been argued at the bar, and in that view it will be considered by this Court.

Assuming, then, that the directors of the parent bank were, as a board, to approve of the bond, so far as it respects the securities, in what manner is that approval to be evidenced?   Without question, the directors keep a record of their proceedings as a board; and it appears by the rules and regulations of the parent bank read at the bar, that the cashier is bound " to attend all meetings of the board, and to keep a fair and regular record of its proceedings."   If he does not keep such a record, are all such proceedings void, or is the bank at liberty to establish them by secondary evidence?   In the present case, (we repeat it,) the whole argument has proceeded upon the ground as conceded, that no such record exists of the approval of the present bond.

The charter of the bank does not, in terms, require that such an approval shall be by writing, or entered of record. It does not, in terms, require that the proceedings of the directors shall generally be recorded, much less that all of them shall be recorded.   It seems to have left these matters to the general discretion of the corporation, and of the directors ; and though it obviously contemplates that there will be books kept by the corporation which will disclose the general state of its affairs, it is not a just inference that it meant that every official act of the directors should be recorded, of whatever nature it might be.   And if it had, it would deserve consideration, whether such provisions ought to be deemed conditions precedent, without which the act was void, or only directory to the officers in the performance of their duty, the omission of which might subject

themselves to responsibility, and the corporation itself to the imputation of a violation of its charter. There are many cases where an act is prescribed by law to be done, and record made thereof, and, nevertheless, if left unrecorded, the act is valid. By the English marriage act, registers of marriages are required to be kept in public books in every parish, and signed by the parties and the minister, and attested by two witnesses. Yet, it has been decided, that such an entry is not necessary to the validity of the marriage, and that an erroneous entry will not vitiate it.[a] So, where a magistrate omits to record an oath of office taken before him, parol evidence of the fact is admissible, though it is an omission of duty.[b] That some of the provisions of the charter and by-laws may well be deemed directory to the officers, and not conditions without which their acts would be utterly void, will scarcely be disputed. What are to be deemed such provisions must depend upon the sound construction of the nature and object of each regulation, and of public convenience, and apparent legislative intention. If a regulation be merely directory, then any deviation from it, though it may subject the officers to responsibility both to the government and the stockholders, cannot be taken advantage of by third persons.[c] In the case of *The Bank of the Northern Liberties* v. *Cresson*, (12 *Serg. & Rawle*, 306.) the directors were required by their own by-laws, to take a bond of the book-keeper with sureties, and they took a bond from sureties without joining the principal. The Court held the bond valid, notwithstanding the by-law, and took notice of the distinction between such provisions of a statute as are essential to the validity of an act, and such as are merely directory. Mr. Justice Duncan said, that it was a matter between the directors and the stockholders, and that the obligors, who had voluntarily entered into the stipulation, could not withdraw themselves from their obligation.

*margin notes:*
1827.

Bank of the U. S. v. Dandridge.

Distinction between an act prescribed by law to be done as a *condition precedent*, or only *directory* to the officers who are to perform it.

a 1 *Phillips' Evid.* ch. 5. s. 2. [826.]

b Bassett v. Marshall, 9 *Mass. Rep.* 312.

c United States v. Kirkpatrick, 9 *Wheat. Rep.* 720. United States Van Zandt, 11 *Wheat. Rep.* 184.

But, waiving for the present this inquiry, we ask, upon what ground it can be maintained that the approval of the bond by the directors must be in writing? It is not required by the terms of the charter, or the by-laws. In each of them the language points to the *fact* of approval, and not to the evidence by which it is to be established, if controverted. It is no where said the approval shall be in writing, or of record. The argument at the bar upon the necessity of its being in writing, must, therefore, depend for its support upon the ground that it is a just inference of law from the nature and objects of the statute, from the analogy of the board of directors to a corporate body, from principles of public convenience and necessity, or from the language of authorities which ought not to be departed from.

Upon the best consideration we can give the subject, we do not think that the argument can be maintained under any of these aspects.

If the directors had been a board constituted by an unincorporated company, or by a single person, for the like purposes, and with the like powers, it would scarcely occur to any person that the acts of the board must, of necessity, be reduced to writing, before they would bind their principal. The agents of private persons are not usually in the habit of keeping regular minutes of all their joint proceedings, and hitherto there has been no adjudication, which requires such a verification of their joint acts. Yet, innumerable cases must have arisen, in which such a principle might have been applied with success, if it had ever been supposed to possess a legal existence. The acts of private and public trustees, of joint agents for commercial purposes, of commissioners for private objects, and of public boards, must have presented many occasions for passing upon such a doctrine. The silence of the books under such circumstances, would form no inconsiderable answer to the argument, connected, as it must be, with the knowledge of the loose and inartificial manner in which much of the business of agencies is generally conducted. There may be, and undoubtedly there is, some convenience in the preservation of minutes of proceedings by agents; but their subsequent acts are often just as irresistible proof of the existence of prior

*1827.*

*Bank of the U. S.*
*v.*
*Dandridge.*

*Approval of the bond by the directors, need not be in writing.*

dependent acts and votes, as if minutes were produced. If
a board of directors were created to erect a bridge, or make
a canal or turnpike, and they proceeded to do the service,
and under their superintendence there were persons em-
ployed who executed the work, and the board proceeded to
pay them therefor out of funds in their hands, these facts of
public notoriety would be as irresistible evidence of the
due execution of their authority, and of due contracts made,
and proceedings had by the board, as if the proceedings
were recorded in the most-formal and regular manner. Can
there be a doubt that, in the cases put, many contracts are
so varied and rescinded, many acts done and assented to by
the board, which never are reduced to formal votes, and de-
clarations, and written proofs? We think we may safely
say, that the sense of the profession, and the course of pri-
vate business, have never, hitherto, in respect to private
agencies and boards, recognised the existence of any rule
which required their acts and proceedings to be justified by
written votes.

What foundation is there for a different rule in relation to
agencies for corporations ? The acts of a single duly au-
thorized agent of a corporation, within the scope of his au-
thority, bind the corporation, although he keeps no minutes
of such acts. They may be, and they are, daily proved
*aliunde.* In what respects do the acts of a board of agents
differ from those of a single agent, in their operation as evi-
dence ? A board may accept a contract, or approve a se-
curity by vote, or by a tacit and implied assent. The vote
or assent may be more difficult of proof by parol evidence,
than if it were reduced to writing. But, surely, this is not
a sufficient reason for declaring, that the vote or assent is in-
operative. If a board of directors agree to build a banking
house, and it is accordingly built, and paid for by their
cashier, with their assent, is the whole proceeding to be
deemed void, because, in the progress of the undertaking,
from accident, or negligence, the votes and the payments
have not been verified by regular minutes ? But, it is said,
that in the present case, the cashier is required to keep a
fair and regular record of the proceedings of the directors.
But if this is admitted, it does not establish the purpose for

1827.

Bank of the
U. S.
v.
Dandridge.

which it is used. It is a by-law of the corporation, directory to its officers, enacted for its own security and benefit, and not for the purpose of restricting the acts of the directors. If the cashier should neglect to keep such records, or should omit any single vote. the by-law has not declared that the vote shall be void, and the proceedings nugatory. Suppose no such by-law had been passed, would not the votes of the board have bound the corporation? If they had discounted notes, taken mortgages, advanced money, and bought stock by faith of *viva voce*, unrecorded votes, and evidence of the existence of these acts and votes necessarily resulted from the other proceedings of the bank, could it be the intention of the legislature that they should be utterly void? or of the stockholders, that any by-law should operate a legal extinguishment of their title to the property? It seems to us difficult to imagine that such could be the legislative or corporate intention. If, in ordinary cases, such an intention could not be inferred in order to produce a very strict and inconvenient construction of the charter, there is still less reason to apply it to the cases of approval of official bonds. These are taken exclusively for the security and benefit of the bank itself, and not of mere strangers. The approval is matter of discretion in the directors, and that discretion once being exercised, it is of very little consequence to the bank whether a written minute of the vote be made or not. All that the bank is interested in is, that there shall be an approval; and it matters not whether the fact is established by a direct record, or by acts of the directors, which recognise its prior existence.

It has been supposed by the defendant's counsel, that the case of *Beatty* v. *The Marine Insurance Company*, (2 *Johns. Rep.* 109.) is in point in his favour. Upon an examination of the facts of that case, we think it is otherwise. In that case, the incorporating act provided that no losses should be paid without the approbation of at least *four* of the *directors*, with the president and his assistants, or a majority of them. The attempt was to charge the company with a total loss, upon a verbal agreement made by the *president* and *assistants*, to accept an abandonment, and pay a total loss, at a meeting, when it did not appear that a single di

rector was present. The board therefore was not so con-
stituted as to bind the company. Mr. Justice Thompson,
in delivering the opinion of the Court, said, " no part of the
case will warrant an inference that any of the directors
were present at the time of the alleged acceptance. When
the plaintiff's agent called to know the determination of
the company in relation to the payment of the loss, he says,
the secretary went into the room where the president and
assistants were conven d, and the answer returned was,
that the president and assistants had agreed to pay a total
loss; but no mention is made of any of the directors being
present. or assenting to it. When the testimony is positive
as to the persons by whom the acceptance is made, there is
no room left for *presumption*. If any of the directors were
present, so as to make the act binding on the company, the
plaintiff ought to have shown it affirmatively. We are of
opinion, therefore, that the acceptance, not having been
made by the *agents* constituted by the act of incorporation,
cannot be binding on the company." The case, therefore,
so far as it goes, is against the defendants. It carries an al-
most irresistible inference, that the Court did not think a
written vote of acceptance necessary, and that parol proof
would have been sufficient. No other authority has been
produced to sustain the argument; and it cannot be doubted,
that if any did exist, the researches of the counsel would
have brought it before the Court. We may therefore con-
sider that it is a new doctrine, unsupported by prior cases,
and to be established now for the first time. We think that
the reasons of public convenience and individual safety and
protection, would not be promoted by establishing it.

On the other hand, every case which has been adduced
to show that corporate acts need not always be reduced to
writing, but may be proved by presumptions, is, *a fortiori*,
an authority against the argument. There are, however,
some cases, which confirm in a very clear manner the doc-
trine for which we contend, and which have not been yet
particularly adverted to. In the case of *Apthorp, Treasurer
of the Commonwealth*, v. *North*, (14 *Mass. Rep.* 167.) a suit
was brought on the official bond of a coroner. By the laws
of Massachusetts, the bond was required to be approved by

1827.

Bank of the
U. S.
v.
Dandridge.

the Court of Common Pleas of the county. It was delivered into the Court of Common Pleas by the first Justice thereof, and remained on its files for some time. No record was ever made of its approval by the Court of Common Pleas ; and at the trial, contradictory evidence was offered, of a presumptive nature, as to its approval and rejection by that Court. It was held, that notwithstanding there was no record of any approval, the bond might well, upon the circumstances, be deemed to have been duly delivered and approved. Chief Justice Parker, in delivering the opinion of the Court, said, " A formal act, or certificate of approbation by the Court, is not made necessary by the statute ;" and after commenting on the terms of the statute, he added, " it is not, then, required expressly that any record or certificate should be made, that the bond given was approved. But if such bond is found upon the files, without any evidence accompanying it that it has been rejected, and the principal has proceeded to execute the duties of his office, the presumption is violent, if not conclusive, that the bond was received by the Court as the security required by the statute." In *Foster* v. *The Essex Bank*, (17 *Mass. Rep.* 479.) there was no clause in the charter respecting the receipt of special deposits, and no by-law had ever been made by the corporation or the directors on the subject. But the practice had long prevailed to receive such deposits, and was known to the directors, though no vote could be found recognising them. The Court held the bank liable for the safe keeping of such deposits, like a common bailee, without hire, upon the ground that there was a plain adoption of them, from the knowledge and acquiescence of the directors. The case of *The Dedham Bank* v. *Chickering*, (3 *Pick. Rep.* 335.) approaches still nearer the present case, and discussed the very point now in judgment. It was the case of an official bond, given by the cashier of the bank, with sureties. The charter required that the cashier, before he entered upon the duties of his office, should give bond, with two sureties, to the satisfaction of the directors. After the cashier was elected, the directors passed a vote, that A. B. and C. D. be accepted as sureties in a bond *to be given* by the cashier for the faithful discharge of the duties of his

office. The bond in question was dated before this vote; but does not seem to have had but one surety. That circumstance, however, was not relied on at the argument; but the principal ground was, that there had been no approval of the bond by the board of directors. It was found on their files, and the cashier had been frequently re-elected. Chief Justice Parker, in delivering the judgment of the Court, said, " We should have supposed that in the case as well of a corporation as of an individual, a paper intended for their benefit, and found on their files, would be considered as accepted by them;" and after alluding to the decision of the Circuit Court in this case, which required the record of a vote of the directors, he added, " We think, however, that the case before us may be decided without touching that principle, for, admitting it to be correct, we are, nevertheless, of opinion, that the vote to accept the sureties, and the bond being in possession of the President, are a sufficient acceptance of the bond." It is impossible, we think, to doubt, that the real opinion of the Court was, that the acceptance might be proved without any record of a vote, and that the very facts of the case brought the point of implied and presumptive acceptance from other acts of the directors completely in judgment.

So far, then, as authorities entitled to very great respect and deference go, we are of opinion, that they are against the reasoning assumed on behalf of the defendants.

To all the authorities cited at the bar on this point, the counsel for the defendants has made one answer, which he deems applicable to all of them. It is this, that where no particular form for the expression of the corporate will is prescribed by law, there it may be inferred from corporate acts; but that where such a form is prescribed, it must be followed. This distinction, he supposes, will reconcile all the cases. The distinction, if admitted, will not aid the argument. It may be, and, indeed, is conceded, that no corporate act can be valid, if done differently from the manner prescribed by law, as essential to its validity. If in the present case the statute had prescribed that nothing but a *written* vote on record should be deemed an approval of the bond, or that the cashier should not be deemed, for any purpose, in

1827.      office, until such approval, the consequence contended for
would have followed.  His acts would have been utterly
Bank of the void, and any unrecorded vote of approval nugatory.  But
U. S.   the very point in controversy is, whether such written re-
v.    cord be necessary by the charter or by-laws, not as a mat-
Dandridge.  ter of convenience or discreet exercise of authority, but as
a *sine qua non* to the validity of the act.  The cases which
have been commented on by the Court, do not deny the dis-
tinction, but proceed upon the ground, that unless posi-
tively required by law, a written vote is not to be deemed
indispensable.  The Court then is called upon, not to admi-
nister a doctrine of strict, and settled, and technical law, but
to introduce a new rule into the law of evidence; and to
exclude presumptive evidence, not only of the acts of cor-
porations, but of their unincorporated agents.  If such a
rule be fit to be adopted, it must be upon the foundation of
some clear and unequivocal analogy of law, and public po-
licy and convenience.  We are not prepared to admit that
it has any such foundation.  On the contrary, we are per-
suaded that the introduction of the rule itself would be at-
tended with serious public mischiefs, and shake many titles
and rights, which have been consummated in entire good
faith, and the confidence that no such written record was
necessary to their validity.  We cannot therefore assent to
the doctrine decided in the Circuit Court on this point.

In respect to a collateral argument urged at the bar, upon
the point whether the terms of the charter and by-laws
would be complied with, without an express vote that the
bond was " to the *satisfaction* of the directors," or that the
sureties of the bond were " approved" by the directors, we
are of opinion, that in either case there need not be express
votes of approval and satisfaction.  An acceptance of the
bond by the directors would, necessarily, in *intendment* of
law, include the approval of it, and be conclusive of it.

Judgment on     The remaining point is as to the opinion of the Court de-
the first excep- livered in the first bill of exceptions.  If that opinion meant
tion.
to state what it seems to import, that the cashier was not le-
gally cashier, so as to bind the bank in its rights and interests
by his acts, if permitted to enter upon the duties of his of-
fice, before a satisfactory bond was given, we think it cannot

be maintained. The cashier was duly appointed, and he was permitted to act in his office, under the express sanction of the directors, for several years. If he had never given any bond whatsoever during this period, yet his acts within the scope of his authority would have bound the bank. Notes signed by him would be lawful notes; moneys paid by him would be irrecoverable; records kept by him would be bank records. Indeed, it is conceded by the defendant's counsel, that the bank would, under such circumstances, be bound by his acts in favour of third persons, acting upon the faith of his public character. The same principle, in our opinion, applies in favour, as against the bank. If he could legally perform the duties of the office for any purposes, he could for all. He was either an agent, capable of binding the bank in all his official acts, or those acts were void as to third persons as well as the bank. If he was held out as an authorized cashier, that character was equally applicable to all who dealt with the bank, in transactions beneficial as well as onerous to the bank. It seems to us, that the charter and the by-laws must be considered in this respect as directory to the board, and not as conditions precedent. The language is not more strong than that of the laws which came under the consideration of this Court, in the *United States* v. *Kirkpatrick*, (9 *Wheat. Rep.* 720.) and the *United States* v. *Van Zandt*, (11 *Wheat. Rep.* 184.)

Our view of this matter is in exact coincidence with that entertained by the Supreme Court of Pennsylvania, in the *Bank of the Northern Liberties* v. *Cresson*, (12 *Serg. & Rawle*, 306.) The directors might have been responsible for their neglect of duty; but it was a matter wholly between themselves and the stockholders, and between the latter and the government, as a violation of the charter and by-laws.

So far, indeed, as respects the sureties to the bond, they may not be responsible for any breaches of official duty by the cashier, before their obligation has been accepted. But this is a very different consideration from that which respects the legal effects of the acts of the cashier himself upon the interests and transactions of the bank itself.

This is the substance of what we deem it necessary to

*Margin notes:*
1827.
Bank of the U. S.
v.
Dandridge.

Not necessary that the official bond of the cashier should be accepted as satisfactory by the directors, in order to enable him to enter legally on the duties of his office.

1827.

Bank of the
U. S.
v.
Dandridge.

say upon the present occasion. We do not go into the consideration of the admissibility of every part of the documents and testimony offered in evidence. Perhaps some of them were in a shape not exactly fit to be admitted as formal evidence, without farther verification and proofs. But much of it was of a nature unexceptionable, as conducing to proof of the issues joined, if any thing short of record proof were admissible, as competent to establish the approval or acceptance of the bond. It is not understood that the Circuit Court entertained any doubt as to its general competency, except upon the ground already stated. We are of opinion, that the evidence was competent, in-point of law, to go to the jury, notwithstanding there was no record of approval of the bond, it being in its nature competent; its sufficiency to establish the issues was matter of fact, the decision of which belonged to the jury; and upon which they ought to have been allowed to pass their verdict.

The judgment of the Circuit Court must be reversed, and a mandate awarded, with directions to the Circuit Court to award a *venire facias de novo.*

Mr. Chief Justice MARSHALL dissented. I should now, as is my custom, when I have the misfortune to differ from this Court, acquiesce silently in its opinion, did I not believe that the judgment of the Circuit Court of Virginia gave general surprize to the profession, and was generally condemned. A full conviction that the commission of even gross error, after a deliberate exercise of the judgment, is more excusable than the rash and hasty decision of an important question, without due consideration, will, I trust, constitute some apology for the time I consume in stating the reasons and the imposing authorities which guided the Circuit Court in the judgment that has been reversed.

The case before that Court depended on the question whether the official bond of the cashier, on which the suit was brought, bound the defendants.

As preliminary to the investigation of this question, I shall state some propositions belonging to it, which are supposed to be incontrovertible. All admit that delivery is essential to the validity of a deed, and that acceptance is essential to a complete delivery. If this be true, they must

be proved in every case where they are put in issue by the pleadings. This proof varies according to circumstances. If there be subscribing witnesses to the instrument, it can be proved only by them, if attainable. If unattainable, or if there be no subscribing witnesses, other proof may be admitted; but, in every case, a delivery and acceptance must be legally proved.

If, in transactions between individuals, where a deed is without a subscribing witness, proof of the signature of the maker, accompanied with the facts that the instrument has passed out of his hands, and is in the possession of the person for whose benefit it was made, be *prima facie* evidence of its delivery, it is because delivery by mere manual tradition, without witnesses, is good; and the assertion of title under it is proof of acceptance, because that requires only the assent of the mind, which assent is legally manifested by asserting a claim to it. That a plaintiff may maintain his action by this evidence, does not show that delivery and acceptance are unnecessary, or that proof of them can be dispensed with; but that, in ordinary cases, this evidence amounts to such proof. If, however, a case should occur in which the possession of the instrument by the party claiming under it, does not afford legal *prima facie* evidence of delivery and acceptance, because such party is incapable of receiving and assenting to the instrument in a form which can be legally proved or inferred from those facts, then such other facts must be shown on the trial as will establish a lawful delivery and acceptance.

I state these legal axioms, at the hazard of being thought tedious, because they appear to me to have a direct bearing on the case before the Court.

The plaintiff is a corporation aggregate; a being created by law; itself impersonal, though composed of many individuals. These individuals change at will; and, even while members of the corporation, can, in virtue of such membership, perform no corporate act, but are responsible in their natural capacities, both while members of the corporation, and after they cease to be so, for every thing they do, whether in the name of the corporation or otherwise. The corporation being one entire impersonal entity, distinct

from the individuls who compose it, must be endowed with a mode of action peculiar to itself, which will always distinguish its transactions from those of its members. This faculty must be exercised according to its own nature.

Can such a being speak, or act otherwise than in writing? Being destitute of the natural organs of man, being distinct from all its members, can it communicate its resolutions, or declare its will, without the aid of some adequate substitute for those organs? If the answer to this question must be in the negative, what is that substitute? I can imagine no other than writing. The will to be announced is the aggregate will. The voice which utters it must be the aggregate voice. Human organs belong only to individuals. The words they utter are the words of individuals. These individuals must speak collectively to speak corporately, and must use a collective voice. They have no such voice, and must communicate this collective will in some other mode. That other mode, as it seems to me, must be by writing.

A corporation will generally act by its agents; but those agents have no self-existing power. It must be created by law, or communicated by the body itself. This can be done only by writing.

If, then, corporations were novelties, and we were required now to devise the means by which they should transact their affairs, or communicate their will, we should, I think, from a consideration of their nature, of their capacities and disabilities, be compelled to say, that where other means were not provided by statute, such will must be expressed in writing.

But they are not novelties. They are institutions of very ancient date; and the books abound with cases, in which their character, and their means of action, have been thoroughly investigated. In *Brooke's Abridgement*, (title *Corporation*,) we find many cases, cited chiefly from the *Year Books*, from which the general principle is to be extracted, that a corporation aggregate can neither give nor receive, nor do any thing of importance, without deed. Lord Coke, in his commentary on *Littleton*, (66 b.) says, " But no corporation aggregate of many persons capable"

" can do homage."   " And the reason is, because homage must be done in person, and a corporation aggregate of many cannot appear in person; for, albeit, the bodies natural, whereupon the body politique consists, may be seen, yet the body politique or corporate, itself, cannot be seen, *nor do any act*, but by attorney."   So, too, a corporation is incapable of attorning otherwise than by deed, (6 *Co.* 386.) or of surrendering a lease for years, (10 *Co.* 676.) or of presenting a clerk to a living, (*Br. Corp.* 83.) or of appointing a person to seize forfeited goods, (1 *Vent.* 47.) or agreeing to a disseisin to their use. (*Br. Corp.* 34.)   These incapacities are founded on the impersonal character of a corporation aggregate, and the principle must be equally applicable to every act of a personal nature.

Sir William Blackstone, in his *Commentaries*, (v. 1. p. 475.) enumerates, among the incidents to a corporation, the right " to have a common seal."   " For," he adds, " a corporation being an invisible body, cannot manifest its intention by any personal act or oral discourse.   It therefore acts and speaks only by a common seal.   For though the particular members may express their private consents to any acts, by words, or signing their names, yet this does not bind the corporation; it is the fixing of the seal, and that only, which unites the several assents of the individuals who compose the community, and makes one joint assent of the whole."

Though this general principle, that the assent of a corporation can appear only by its seal, has been in part overruled, yet it has been overruled so far only as respects the seal.   The corporate character remains what Blackstone states it to be.   The reasons he assigns for requiring their seal as the evidence of their acts, are drawn from the nature of corporations, and must always exist.   If the seal may be exchanged for something else, that something must yet be of the same character, must be equally capable of " uniting the several assents of the individuals who compose the community, and of making one joint assent of the whole."   The declaration, that a seal is indispensable, is equally a declaration of the necessity of writing; for the sole purpose of a seal is to give full faith and credit to the writing to which it is appended.   The seal in itself, not af-

fixed to an instrument of writing, is nothing; is meant as nothing, and can operate nothing. The writing is the substance, and the seal appropriates it to the corporation.

Though the rule stated by Blackstone may not be so universal as his language indicates, it is certainly of extensive application, and the exceptions prove its extent. Mr. Hargrave, in his notes on *Co. Litt.* (99.) says, " In general, a corporation aggregate cannot take or pass away any interest in lands, *or do any act of importance*, without deed, but there are several exceptions to the rule." The question before the Court depends very much on the extent of these exceptions; and on the manner in which this invisible impersonal being must act and speak, when it may act and speak without using its seal.

It is stated in the old books, (*Br. Corp.* 49.) that a corporation may have a ploughman, butler, cook, &c. without retaining them by deed; and, in the same book, (50.) Wood says, " small things need not be in writing, as to light a candle, make a fire, and turn cattle off the land." Fairfax said, " A corporation cannot have a servant but by deed. Small things are admissible on account of custom, and the trouble of a deed in such cases, not by strict law." Some subsequent cases show that officers may be appointed without deed, but not that they may be appointed without writing. Every instrument under seal was designated as a deed, and all writings not under seal were considered as acts by parol. Consequently, when the old books say a thing may be done without deed, or by parol, nothing more is intended than that it may be done without a sealed instrument. It may still require to be in writing. In 2 *Bac. Abr.* 13. it is said, " Aggregate corporations, consisting of a constant succession of various persons, can regularly do no act without writing; therefore, gifts by and to them, must be by deed." In page 340, it is said, " if a corporation aggregate disseise to the use of another, they are disseisors in their natural capacity," " as a corporation they can regularly do no act without writing."

In the case of *The King* v. *Bigg*, (*Strange*, 18.) the prisoner was convicted for erasing an endorsement on a bank note. The indictment and verdict are set forth at large by

*Peere Williams,* (v. 3. p. 419.) and it appears that the note was signed by Joshua Adams, who was intrusted and employed by the Bank of England to sign bank notes, *but not under their common seal.* It was contended by Peere Williams, in an able argument, that the appointment was not valid, because not made under their common seal; and his argument contains an enumeration of decisions previously made, which go far in support of his proposition. The prisoner, however, was condemned, and, consequently, the appointment was held valid. But there is no reason to suppose that it was not made by writing. The verdict finds " that he was intrusted and employed by the governor and company of the Bank of England, *but not under their common seal.*" Consequently his employment was evidenced by writing, if it was necessary; and the negative finding that it was not under their common seal, strengthens the presumption that it was in writing. Peere Williams has reported his argument, and would certainly have taken this objection, had the case afforded it. I consider the appointment of Adams, then, as having been made in writing, though not under seal.

Mr. *Fonblanqu'* says, (vol. 1. p. 296. note *o*,) " And the agreement of the major part of the corporation, being entered in the corporation books, though not under the corporate seal, will be decreed in equity." The inference is strong that it will not be decreed unless it be entered on the corporation books. Consequently, unless it be so entered, it is not an agreement, for every lawful agreement which is in itself equitable, will be decreed in equity.

In the *Mayor of Thetford's case,* (1 *Salk.* 192.) Lord Holt said, that though a corporation cannot do an act *in pais* without their common seal, they may do an act on record, and that is the case with the city of London, which makes an attorney in Court annually by warrant; and the reason is, they are estopped by the record. Upon the same principle, a return to a mandamus is good, though not under the common seal. In these exceptions to the general rule, the substitute for the common seal must be writing; and the exceptions are stated in terms which exclude every idea that the act can be evidenced otherwise

*Yarborough.* v. *The Bank of England,* (16 *East,* 6.) was an action of trover and conversion, in which, after verdict for the plaintiff, it was moved in arrest of judgment, that the action would not lie, because a corporation was incapable of committing a tort. The action was sustained; and Lord Ellenborough, in delivering the opinion of the Court, said, that a corporation can act only through the instrumentality of others; and wherever they can act, or order any act to be done on their behalf, which, as by their common seal they may do, they are liable to the consequences of such acts. " A corporation cannot be aiding to a trespass, nor give a warrant for a trespass, without writing." His lordship cited several old cases, showing the incompetency of a corporation to act in important matters otherwise than by deed; and added, " But many little things require no special command, as to chase cattle out of their land. These things are incident to the appointment." Several cases are put, in which a corporation may be liable for a trespass; but they are all consistent with his first proposition, that the liability of a corporation must be founded on writing. " If," he says, " the mayor and commonalty disseise me, and I release to 20 or 200 of the commonalty, this will not save the corporation; and the reason is, because the disseisin is in their corporate character, and the release to individuals." So in trespass against the mayor and commonalty of York, they cannot justify under a right of the inhabitants to common, because the right in natural persons gave no right to a corporation. Nor could the corporation give a warrant without writing, to commit a trespass. The foundation of this action is, was the authority in writing given by the corporation? It stands on the same principle with the action of assumpsit made by an agent acting under a written power. The idea that their seal was indispensable to the validity of all corporate acts, which is laid down in such strong terms by Blackstone, and by others, on whom he relied, probably grew out of the state of the times in which it originated; seals were then more frequent and better known than signatures. An instrument was much more certainly authenticated by the seal, than by the name of the maker. This circumstance would bring seals into common use; and as

every corporation possessed a seal of extensive notoriety, and any other mode of authenticating its acts would, in those simple times, be attended with difficulties and perplexities, it is not matter of surprise that this rule should prevail. As writing has become more common, and seals are less distinguishable from each other, the good sense of mankind gradually receives the writing without the seal, in all the less formal and less important transactions of the corporate body. All the reasons derived from the corporate character, which have been assigned for requiring the seal, are satisfied by the writing without it.

The English cases on this subject are very well summed up by Mr. *Kyd*, (p. 259.) The result of the whole appears to be, that in England the general rule is, that a corporation acts and speaks by its common seal, at least so far as respects the appointment of officers, whose duties and powers are important. In those transactions, where the use of the seal would be unnecessary, and extremely inconvenient, it is frequently dispensed with; but in all of them, I think, writing is indispensable. In almost every case which I can imagine, there ought to be, and is, a record in the corporation books. With respect to the necessity of a seal, the difference is certainly great between ancient and modern times; and between corporations, whose principal transactions respected land, and those which are commercial in their character. This distinction may, and ought to influence the use of the seal, but not the use of writing. The inability of a corporation aggregate to speak or act otherwise than by writing, is constitutional, and must be immutable, unless it be endowed by the legislature with other qualities than belong to the corporate character. The English cases, so far as I have had an opportunity of examining them, concur in the principle, that a corporation aggregate can act only by writing. A case from 4 *Barnw. & Cresw.* has been cited at the bar, and undoubtedly deserves attention. I regret that it has not been in my power to examine it. As far, however, as I could judge of it from the statement made at the bar, I did not think that it had over turned what appears to me to be the settled law of England

1827.

Bank of the
U. S.
v.
Dandridge.

1827.

Bank of the
U. S.
v.
Dandridge.

I will now inquire whether the decisions of this Court vary in principle from those of England.

*Head & Amory* v. *The Providence Insurance Company*, (2 *Cranch*, 127.) was an action on a policy of insurance, which the defendants contended had been vacated by a subsequent agreement; and the validity of this agreement constituted the sole question in the cause.

The plaintiffs had proposed terms for vacating the policy, and some communications had taken place through Brown & Ives, their correspondents, which showed a misunderstanding between the parties, and that mutual propositions had been mistaken by the plaintiffs for an acceptance of the terms they had proposed. This produced a letter from the plaintiffs, of the 3d of September, 1800, which was understood by the defendants, and was considered by the Court, as amounting to a renewal of propositions for vacating the policy. The secretary of the company delivered to Brown & Ives, on the 6th of September, the following note :

"Sept. 6th, 1800.

" As there appears to have been a misunderstanding in the business as it respects the first propositions of the company, the directors are willing to accede to Messrs. Head & Amory's proposition, (viz.) to settle the policy on the merchandise at 25 per cent., although it was their intention and expectation to have both policies included in the settlement. Messrs. Head & Amory will please to forward the policy, and have it annulled immediately. Premium due 12—15 September.

" You will please to govern yourself accordingly, and we will attend to your wishes."

This paper was in the handwriting of the secretary, but without signature.

Testimony was given at the trial to show the usage of the insurance companies, to consider an agreement to do an act as equivalent to the performance of the act.

This paper was forwarded by Brown & Ives, on the 9th of September, to the house of Head & Amory, in Boston, and its receipt was acknowledged by their clerks on the 12th, they being at the time absent. On the 17th of Sep

tember, the plaintiffs wrote to Brown & Ives, informing them that, previous to their seeing the letter of the 9th, intelligence was received of the capture of the vessel, which would, of course, prevent any farther negotiation on the subject.

The Circuit Court determined that the agreement to vacate the policy was complete; and the jury found for the defendants. The judgment was brought before this Court, and was reversed; because this informal paper did not amount to an acceptance of the terms proposed by the plaintiffs. The act incorporating the company, enacted, " that policies of insurance, and other instruments, made and signed by the president of the said company, or any other officer thereof, according to the ordinances, by-laws," &c. " shall be good and effectual," &c. The Court considered the company as the mere creature of the incorporating act, and as being capable of exerting its faculties only in the manner which the act authorizes. This paper, not being executed in the form prescribed by law, could not be considered as the act of the company.

On the testimony of the witness concerning usage, the Court observed, that " if he was to be understood as stating that an assent to the formation or dissolution of a policy, if manifested according to the forms required by law, is as binding as the performance of the act agreed to be done, it is probable that the practice he alludes to is correct. But if he means to say that this assent may be manifested by parol, the practice cannot receive the sanction of this Court. It would be to dispense with the formalities required by law for valuable purposes, and to enable these artificial bodies to act and to contract, in a manner essentially different from that prescribed for them by the legislature."

" An individual," the Court added, " has an original capacity to contract and bind himself in such manner as he pleases." " He who acts by another, acts by himself. He who authorizes another to make a writing for him, makes it himself; but with these bodies, which have only a legal existence, it is otherwise. The act of incorporation is, to them, an enabling act. It gives them all the power they possess. It

1827.
Bank of the U. S.
v.
Dandridge.

enables them to contract; and when it prescribes to them a mode of contracting, they must observe that mode, or the instrument no more creates a contract than if the body had never been incorporated."

The Court considered the note of the 6th of September " as a mere informal paper, which might perhaps amount to notice of an act, if such act was really performed, but which is not in itself an act of any legal obligation on the company. That if the proposition contained in the letter of the 3d of September, had been regularly accepted, this note might possibly have been considered as notice of that acceptance, but is not in itself an acceptance."

I have gone the more fully into this case, because, both the decision itself, and the reasoning by which it is supported, appear to me to apply throughout to the case now before the Court.

This subject came on to be again considered in *The Bank of Columbia* v. *Patterson's Administrators*, (7 *Cranch*, 299.) That was an action of assumpsit brought by Patterson's administrators for work and labour done by their intestate for the bank. It was founded on an agreement in writing between Patterson and " a duly authorized committee of the directors of the bank," in their own names. Judgment was given in favour of the administrators, upon which the cause was brought by a writ of error into this Court; and, among other objections to the proceedings below, it was contended, that a corporation aggregate could not promise otherwise than under its seal.

In considering this objection, the Court did not controvert the ancient rule. But this rule, if it ever existed to the extent claimed by the plaintiffs in error, had been relaxed; and it seems at length to have been established, that though corporations could not contract directly, except under their corporate seal, yet they might, by mere vote, or other corporate act, not under their corporate seal, appoint an agent, whose acts and contracts, within the scope of his authority, would be binding on the corporation. It being conceded that the committee were authorized to make agreements, there could be no doubt that a contract made by them in the name of the corporation, would be

binding on the corporation.   But as this promise is made in
their own names, if the principle stopped here, the remedy
would be only against the committee.

The Court proceeds to consider it as a sound rule of law,
that wherever a corporation is acting within the scope of
the legitimate purposes of its institution, all parol contracts
made by its authorized agents are express promises of the
corporation.

In applying this rule of law to the case then under consi-
deration, the Court reviewed the evidence from which the
jury might legally infer, " that the corporation had adopted
the contracts of the committee, and had voted to pay the
whole sum which should become due under the contracts,
and that the plaintiffs' intestate had accepted the engage-
ment."

*The Bank of Columbia* v. *Patterson's Administrators*, dif-
fered from the case of the *Providence Insurance Company*
v. *Head & Amory*, in two essential circumstances.   The
contract which was sustained against the bank was made
through the instrumentality of a legally constituted agent ;
that which the insurance company attempted to set up, pur-
ported to be a direct contract between the company and
the plaintiffs in the cause.   In the case of *The Bank of
Columbia*, the Court said, " At length it seems to have been
established, that though they (corporations) could not con-
tract directly, except under their corporate seal, yet they
might, by mere vote, or other corporate act, not under their
corporate seal, appoint an agent, whose acts and contracts,
within the scope of his authority, would be binding on the
corporation."

The obligation on which this suit was instituted, if it be
an obligation, purports to be a direct contract between the
bank and the individuals who signed the instrument:   It is
not alleged that any agent was authorized to act for the
bank.

Another very essential difference between the two cases
cited from *Cranch* is this : In that of the *Providence Insu-
rance Company*, the corporation attempted to set up an
agreement, which, if it existed, was in its own possession.
It claimed to imply that an act had been performed by it-

1827.

Bank of the
U. S.
v.
Dandridge.

self, the evidence of which was in its own possession, and might be produced. The Court disallowed this implication.

In the case of *The Bank of Columbia*, as in that of the insurance company, the act to be implied was an act performed by the corporation in its own office, without witnesses, the evidence of which remained in its own possession; but it was set up against, not by the corporation. The Court was not of opinion that the suit could be maintained without the existence of this act. No such idea is indicated. On the contrary, the language of the opinion shows very clearly that the act was necessary. If, in order to charge the bank, it was necessary that the corporation should have " adopted the contracts of the committee," and should have " voted to pay the whole sum which should become due under the contracts." The Court enumerates circumstances which were deemed sufficient to justify a jury in implying against the corporation that the bank had performed these acts.

In the case at bar, the suit is brought by the corporation, and the corporation asks the Court to imply that it has performed those acts which are necessary to the validity of the bond on which it sues, although the evidence of its having performed them is in its own possession.

*Fleckner* v. *The Bank of the United States*, (8 *Wheat. Rep.* 338.) was a writ of error to a judgment given by the Court of the United States for the District of Louisiana, in favour of the bank, in a suit instituted against Fleckner on a note given by him, and endorsed to the Bank of the United States by the President, Directors and Company of the Planters' Bank of New-Orleans, through their cashier, as their agent. One of the errors alleged in the proceedings of the Court below was, that the cashier of the Planters' Bank had no authority to make the transfer. The authority was given by a vote of the board of directors to the president and cashier, and the act itself was afterwards affirmed by an instrument of writing under the corporate seal. It was contended that the original vote, empowering the president and cashier to perform the act, ought to have been a power under the corporate seal. In noticing this objection,

the Court said, " Whatever may be the original correctness of this doctrine as applied to corporations existing by the common law, in respect even to which it has been certainly broken in upon in modern times, it has no application to corporations created by statute, whose charters contemplate the business of the corporation to be transacted exclusively by a special body or board of directors. And the acts of such body or board, evidenced by a written vote, are as completely binding upon the corporation. and as complete authority to their agents, as the most solemn acts under the corporate seal."

The Court then proceeded, in a very elaborate and well digested opinion. to maintain that the endorsement was with the official duty of the cashier, that it was within the original power given to the president and cashier, and that, were this otherwise, it was sanctioned by the concluding act under the corporate seal. The whole of this case, as of the two preceding cases, turns upon the idea, that a writing, in due form, on the part of the corporation, is indispensable to the validity of its contracts.

According to the decisions of the Courts of England, then, and of this Court, a corporation, unless it be in matters to which the maxim *de minimis non curat lex* applies, can act or speak, and, of course, contract, only by writing. This principle, which seems to be an essential ingredient of its very being, has been maintained by all the judges who have ever discussed the subject. Upon this principle, and the authority of these cases, I have supposed that a corporation cannot receive and assent to a deed of any description, unless this assent be expressed regularly in writing. It ought to be entered on the books of the corporation.

The counsel for the plaintiffs in error insist, that the proof offered in the Circuit Court was sufficient to establish the full execution of the bond; and they support this proposition upon principle, upon convenience, upon usage, and upon the authority of cases decided in the different States of the Union.

It is, we are told, a general rule, that acceptance by a corporation is a fact which may be proved before a jury, and the acceptance of a new charter is mentioned to illustrate the rule.

1827.

Bank of the
U. S.
v.
Dandridge.

1827.

Bank of the U. S.

v.

Dandridge.

Without question, acceptance is a fact, and is to be proved before a jury ; but the inquiry is, by what evidence may it be proved ?    I have supposed that it must be proved by testimony which shows that the corporation has acted in the form in which alone it is capable of acting; that it has expressed its acceptance in the mode in which such a being is capable of expressing it.    I receive readily the case put of the acceptance of a new charter as an apt illustration of the principle we are investigating, and should be surprised, indeed, if a new charter were to be accepted without a vote of acceptance entered upon the record.    The case cited from 1 *Term Rep.* 575. does not appear to me to sanction the doctrine it is adduced to support.

We are told, too, that there was never a time when a corporation might not take by a deed poll.    But, if this be admitted, I cannot perceive its influence on the case.    A deed poll is in writing, and there is the same necessity that its acceptance should be evidenced by writing as if it were an indenture.    The general assertion which we find in all the books, that a corporation can take only by deed, that is, as I understand it, that the act of taking must be by deed, applies as well to conveyances by deed poll, as by indenture.

We have been also referred to a time anterior to writing, and are asked how corporations then acquired property ?

We have no knowledge of such a time.    Since Europe was subdued and civilized by the arms and literature of Rome, the science of writing, though rare, has never been entirely lost.    So much of it as remained was found most generally in corporate bodies.    If the corporation was not entirely ecclesiastical, which in early times was most frequent, yet there can be little reason to doubt their having, among themselves, or being able to command, a scribe.    Be this as it may, the earliest information we have on the subject tells us that corporations aggregate could only take or grant by deed, under their corporate seal.    Even when land passed from man to man by livery, a corporation could not so grant or take.    Livery could not be made by, or to, a corporation aggregate, because they are personal acts, and it is an impersonal being.    These acts were to be performed

through the agency of an individual having a power to per-
form them under the corporate seal.

We are also told, that the title of the bank to the ground
purchased for a banking house, and to all mortgages taken
for the security of its debts, will be put in hazard by the
principle which I have endeavoured to maintain; that it is
probable not a single conveyance will stand the test by
which the defendant in error proposes to try its validity,
and that the usage is, to receive and deposit them among the
papers of the institution without taking any notice of them
on its records.

I can scarcely suppose it possible that so loose a practice
can have prevailed. I can scarcely suppose it possible,
that, on points of such vital importance, and of such rare
occurrence, the plain requisites of law can have been so
entirely disregarded. Deeds of mortgage, as well as of
ground for necessary buildings, are conveyances of lands,
and if any one legal proposition is laid down without a sin-
gle exception, it is this, that a corporation aggregate cannot
take lands otherwise than by deed. To me it would appear
very incautious to take such conveyances otherwise than as
is prescribed in the books, that is, by appointing an attorney
under the corporate seal to receive them; but, however
this may be, I can scarcely suppose it possible, that an act
so easily performed as to enter their assent in their own
books, should be habitually neglected. That the current
business of the bank should sometimes want the requisite
forms, might be excused, but that the same failure should
take place in single transactions, which seldom take place,
and are yet of great importance, seems to me to be scarcely
possible. I should not be inclined to act judicially on the
presumption that the fact exists. If it does, the mischief
may be corrected by correcting the practice.

The counsel for the plaintiff rely very much on the cases
which have been decided in the States of Pennsylvania,
New-York, and Massachusetts.

In the case mentioned at the bar, from Pennsylvania, a
demurrer was filed to a plea in bar of the action on a cashier's
bond, which brought up the very question in consideration
before this Court. The argument was opened by the coun-

sel for the plaintiff, but he stopped in the midst of it, and withdrew his demurrer without submitting the point to the Court.

The cases in New-York have not, I think, gone farther than *The Bank of Columbia* v. *Patterson's Administrators.* Those of Massachusetts have, I admit, gone the full length for which the plaintiffs contend, and the point is probably settled in that State. It would be presumptuous in me to place my understanding of those decisions in opposition to that of professional gentlemen from that State, but to me it seems, that even there the doctrine has not been uniformly maintained. *Bigelow's Digest* of Massachusetts cases contains this passage : " Aggregate corporations cannot make a parol contract, unless by the intervention of some agent or attorney duly authorized by a corporate vote to contract on their part, because there is no other way in which they can express their assent." He cites 7 *Mass. Rep.* 102. in which Chief Justice Parsons said, " We cannot admit that a corporation can make a parol contract unless by the intervention of some agent or attorney duly authorized to contract on their part."

In the *Essex Turnpike Company* v. *Collins,* (8 *Mass. Rep.* 292.) the Court said, " Aggregate corporations cannot contract without vote, because there is no other way in which they can express their assent."

In the case of *Hayden* v. *The Middlesex Turnpike Corporation,* (10 *Mass. Rep.* 397.) the work for which the action was brought was performed on the road. The committee appointed to contract for, and superintend it, was frequently present while it was going on, and directed the workmen. Other directors were also present, and one of them swore that he supposed the work to be going on by order of the directors. But the contract was not in exact conformity with the written authority under which the committee acted. A verdict taken for the plaintiff, subject to the opinion of the Court, was set aside, and the Court said, " No individual member can represent the corporation in their aggregate capacity, but in consequence of their consent. The requisite evidence of this, at common law, was a deed under the seal of the corporation. Aggregate corporations, establish-

ed by statute, are not restricted to that formality. They have power given them to order their affairs, and to appoint and employ agents by votes, or in such other manner as the corporation may by their by-laws appoint." Again: "Nor can a parol declaration, made to the corporators at a corporate meeting, by any individual, amount to a contract between such individual and the corporation."

In *The Proprietors of the Canal Bridge* v. *Gordon,* (1 *Pick. Rep.* 297.) the Court decided, that a corporation could be bound without a vote, by implication from corporate acts. This, however, was in a suit brought against a corporation, and attended with circumstances extremely well calculated to strengthen every presumption against them. The corporation might have passed the vote, though it was not in the power of the plaintiff to produce it, and their acts afforded the strongest probability in favour of the implication that they had passed it. I should not consider this case as conclusive evidence that the same Court would have drawn the same inference from the same circumstances, in a case in which the corporation was plaintiff. But, in the case of *The Inhabitants of the First Parish in Sutton* v. *Cole,* the corporation was plaintiff, and the validity of an entry into land was one of the points made in the cause. The corporation had appointed two agents for the purpose, but the entry was made by one only. This entry was held to be made not in pursuance of the authority, but it was also held, that the action brought by the corporation was a ratification of the entry. This I admit to be a decision expressly in point. But, thinking it a case in opposition to the whole course of decisions in England, as well as in this Court, and not supported by decisions in other States, or by a long course of decisions even in the State of Massachusetts, I should not, perhaps, highly respectable as it undoubtedly is, and as I certainly think it, have felt myself warranted in yielding to it, had it even been known to me.

It has been contended, that the act of Congress incorporating the bank, does not, in terms, require that it shall keep a record of its proceedings; and from this omission, it has

been inferred, that a record is unnecessary. I cannot assent to the correctness of this inference.

When a being is created without the organs of speech, and endowed only with the faculty of communicating its will by writing, we need not look in the laws given by its creator, for a prohibition to speak, or a mandate to write. These are organic laws which it is compelled to observe. If we find, in the act of its creation, an enumeration of duties and powers which are to be performed and exercised by writing, it is evidence that the creator considered it as certain that the creature would write, and that the evidence of its conformity to the will of the creator would be found in writing. It is equivalent to a declaration that it shall act by writing.

Let the charter be examined with this principle in our minds.

The 8th section empowers the stockholders to choose directors for the management of their affairs, but does not require that the election shall be evidenced by writing. Is it to be believed, that Congress could have intended that an act, on which all the operations of the corporation depended, which might be controverted in every action it should institute, might rest upon the uncertain, and, perhaps, contradictory recollection of the individuals who were present.

The fairness of an election may be contested; the mode of voting is prescribed by law. Can it be that Congress supposed no provision was made which secured written testimony, by which such contests might be tried?

The directors are to elect one of their body as president; is no record to be kept of this election? Can we presume so much carelessness in Congress, as to suppose it possible that matters of such consequence should be left to the loose proof which the memory of individuals might furnish? The act prescribes the notice which shall be given of the time and place of holding the election; and adds, " it shall be lawful for such election to be then and there made." The legality of the election depends on time and place. Did Congress mean that these facts should rest on memory?

The 10th section empowers the directors, for the time be-

1827.

Bank of the
U. S.
v.
Dandridge.

ing, to appoint officers, and to allow them a compensation; and to exercise such other powers for the well governing of the officers of the corporation, as shall be prescribed by its laws. May all these acts be found only in the frail memory of individuals?

The 4th rule of the fundamental articles provides, that not less than seven directors, of whom the president, or some person deputed by him, shall be one, shall constitute a board for the transaction of business; but there is no clause in the charter requiring a board. Can it be pretended, that not less than seven directors may make a board, and yet, that the directors may act without being assembled as a board? Congress has not thought it necessary to forbid their acting otherwise than as a board, because the whole law of corporations forbids it.

In the event of making unlawful loans, the directors are made personally responsible; but those are exempted who were absent, or who dissented from the resolution or act whereby the same was so contracted or created.

No clause in the charter directs that loans shall be created only by writing. The bond of the debtor may be said to be sufficient. Yet this clause is obviously drawn in the idea, that all the proceedings on the subject would necessarily be in writing. The absentees and dissentients are excused. How is this absence or dissent to be proved? Is it to depend on vague and uncertain memory?

The same observations apply to the limitations and restrictions which are found in the 9th and 10th rules of the fundamental articles.

The 13th rule declares, that semi-annual dividends shall be made, but does not direct that they shall be declared in writing. May the bank so manage its affairs, that no trace of these dividends shall be found on its books?

The 16th rule declares, that no stockholder, unless he be a citizen of the United States, shall vote in the choice of directors, but does not direct that written lists shall be taken. May they be dispensed with? Is the question who has voted to depend on recollection solely?

The 23d section subjects the books of the corporation to the inspection of a committee of either house of Congress

But there is no clause in the charter which directs the corporation to keep any books. May this be set up as an excuse for not opening books containing their transactions for the inspection of a committee of Congress?

How are we to account for all these strange omissions? Strange and unaccountable they would certainly be, on any other hypothesis, than that the law of its being, required that it should speak and act by writing. Aware of this, Congress did not deem it necessary to enjoin upon it, that it should act in the only mode in which its organs enabled it to act, and that it should abstain from what its organs did not enable it to do.

It may be said, that although certain things ought to appear in writing, it is not necessary that all the transactions of a bank should so appear; and the assent of the directors to the bonds given by their cashiers, need not appear. Such grave acts or omissions as may justify the suing out a *scire facias*, to vacate the charter, ought to be evidenced by their records; but such unimportant acts as taking bonds from their officers, need not appear. These may be inferred.

I do not concur in this proposition. I neither admit the distinction which has been alleged, nor do I admit that the bond of a cashier is to be classed with unimportant transactions. Congress has not prescribed the intrinsic importance which shall entitle any transaction of a bank to a place on its record, but has legislated on the idea that a record of its proceedings will be kept. And if such a distinction could be found, the bonds of officers, intrusted with all the money of the bank, are among the most interesting of its duties. Congress has manifested this opinion, by enacting, that "Each cashier or treasurer, before he enters upon the duties of his office, shall be required to give bond, with two or more sureties, to the satisfaction of the directors, in a sum not less than 50,000 dollars, with a condition for his good behaviour, and the faithful performance of his duties to the corporation."

Congress, then, considered the bonds to be given by the cashiers as a subject of real importance; and Congress was right in this opinion. It requires very little knowledge of the interior of banks, to know that the interests of the stock-

1827.

Bank of the
U. S.
v.
Dandridge.

holders are committed, to a very great extent, to these and other officers. It was, and ought to have been, the intention of Congress to secure the government, which took a deep interest in this institution, and to secure individuals, who embarked their fortunes in it, on the faith of government, as far as possible, from the mal-practices of its officers. One of the means employed for this purpose is the bond required from the cashier. Are the directors at liberty to dispense with this requisition? I think they are not.

Should a committee of Congress, on inspecting the books of the corporation, find that cashiers were acting without bonds, would not such gross negligence, such utter disregard of the positive mandate of the law, furnish serious cause for a *scire facias* to vacate the charter?

It has been urged, that the rule for which the defendants contend, would break in upon all the usages of the bank, invalidate all the notes they have discounted, and destroy their liability for deposits.

I do not think so. I do not profess to understand banking operations; but I think the counsel for the defendants has plainly shown, that not a single note is discounted, without evidence, in writing, on the note itself, or on the books of the bank, or on both. It is admitted, that the official acts of the officers of the bank are binding, and, of course, written memorandums made by such officer, in pursuance of orders of the board, whether on the note itself, or in a book, is a corporate act, is written evidence of such order of the board of direct is as the writing imports. The counsel for the defendant has, I think, shown from " the rules and regulations for conducting the business of the Bank of the United States;" as well as from the practice under those rules, that all transactions of that character are, as they ought to be, in writing He has shown also, conclusively, as I think, that full provision is made both for general and special deposits; and, in my judgment, every difficulty of this description is removed by the 23d rule, which shows that a regular record is, as it ought to be, kept of all the proceedings of the board of directors. So much of that rule as applies to this subject is in these words:

" The proceedings of the board of directors, when con-

ducting their business as a deliberative body, shall be govern-
ed by the following articles:

" 1st. When the president takes the chair, the members
shall take their seats.

" 2d. The minutes of the preceding meeting shall be read
before the board proceeds to any other business; and no
debate shall be admitted, nor question taken at such read-
ing, except as to errors and inaccuracies. The state of the
bank shall then be read, and the discounts settled.' "

The board, then, does act as a deliberative body and does
keep a minute of its proceedings, which are to be read over
and corrected. On what subject does the board deliberate,
if not on the measures which are to be taken for the secu-
rity of its debts, and on the sufficiency of the sureties in the
bonds given by the officers who have the management of its
funds? Most especially is it bound to deliberate on the
bonds to be given by the cashiers of the bank. This is a
subject on which the directors are particularly commanded
to exercise their judgment by one of the fundamental arti-
cles of the constitution of the corporation. That article re-
quires, that " each cashier or treasurer, before he enters upon
the duties of his office, shall be required to give bond, with two
or more sureties, to the satisfaction of the directors, in the sum
of 50,000 dollars, with a condition," &c. Is not the suffi-
ciency of this bond, then, most especially a subject for deli-
beration? If it be, how is this deliberation to be con-
ducted? The rules prescribe the mode with precision, and
go so far as to direct, that " at the request of any two of the
board, the names of the members who make and second a
motion, shall be entered on the minutes." The bond must
be offered, and the question ought to be put, and must be
put, whether it shall be accepted. The acceptance is ne-
cessary to the completion of delivery, and is the only proof
which can be given of that fact, unless it be delivered to an
attorney, previously appointed by a board to receive it.
Acceptance, undoubtedly, includes approbation, but is the
deliberate act of the board, and must appear in their mi-
nutes. If it must, a copy of those minutes is, in a suit
brought by the bank, the only admissible evidence of the
fact.

I think it worthy of remark, that among these rules and regulations, not one is found which ordains that a record shall be kept, in which the proceedings of the directors shall be inserted. They are framed upon the idea, that one must be kept. We find them speaking of the minutes, as if their existence was indispensable, and need not be prescribed. Imitating the charter, in this respect, it was deemed unnecessary to ordain that a being should write, whose organization gave it not the means of transacting business otherwise than by writing.

The counsel for the plaintiffs has sought to escape the almost insuperable difficulties which must attend any attempt to maintain the proposition, that a corporation aggregate can act without writing, by insisting that the directors are not the corporation, but are to be considered merely as individuals who are its agents.

If this proposition can be successfully maintained, it becomes a talisman, by whose magic power the whole fabric which the law has erected respecting corporations, is at once dissolved. In examining it, we encounter a difficulty in the commencement. Agents are constituted for special purposes, and the extent of their power is prescribed, in writing, by the corporate body itself. The directors are elected by the stockholders, and manage all their affairs, in virtue of the power conferred by the election. The stockholders impart no authority to them, except by electing them as directors. But, we are told, and are told truly, that the authority is given in the charter. The charter authorizes the directors to manage all the business of the corporation. But do they act as individuals, or in a corporate character? If they act as a corporate body, then the whole law applies to them as to other corporate bodies. If they act as individuals, then we have a corporation which never acts in its corporate character, except in the instances of electing its directors, or instructing them. The corporation possesses many important powers, and is, as a corporation, to perform many important acts, scarcely one of which is to be performed in a corporate character. They are all to be performed by agents, acting as individuals, under general powers conferred by the charter.

1827.

Bank of the
U. S.
v.
Dandridge.

It cannot escape notice, that this rule, if it be one, would apply to almost all corporations aggregate, and would abolish the distinction which has been taken between those which act by an individual, and those which act by an aggregate of persons. The first partakes of the qualities of a sole corporation, the last of a corporation aggregate.

This rule would apply to almost every corporation aggregate which exists, or which ever has existed. The exceptions are the very few in which all the members are active, or in which the corporation acts by a single individual who is its head. All others act by boards usually described in the charter. If the president and directors of the Bank of the United States act as individuals, then it would seem, that the managers of every other corporation, being in like manner created by charter, and being in like manner empowered by charter to transact all the affairs of the corporation, would likewise act as individuals, and the whole doctrines of the law upon the subject, would find nothing to which they are applicable.

But these doctrines grow out of adjudged cases, and Courts have always considered those official agents, whose powers are described in the charter, and who act collectively, as acting in a corporate character. The idea has, I believe, never before been suggested, that their acts were to be treated as the acts of individuals. They do not appear as individual acts ; they are not in the name of individuals, but of the corporate body. In all the cases which have come before this Court, that of *The Bank of Columbia* v *Patterson's Administrators,* as well as all others, directors are considered as acting in their corporate character. In the cases in England, where the Bank of England has been a party, and in all others, the same view has always been taken of the subject.

The president and directors form, by the charter, a select body, in which the general powers of the corporation are placed. This body is, I think, the acting corporation ; and, according to the 4th article of the fundamental rules, seven of them, including the president, or the director deputed by the president, are necessary to constitute a board. The act of the major part of the board, is the act of the whole, and binds the corporation; but this act must. on general

principles, be done at one and the same time, and at a regular meeting held for the purpose. (*Kyd. Corp.* 309.) Its validity depends on the legal constitution of the board, and on its being the act of the body. These essential requisites must be shown; and to show them, the board must keep a record of its proceedings. Were the by-laws silent on the subject, this would be, as I think, rendered indispensable, by the fact, that it is the act of a corporation aggregate.

If there must be a record of their proceedings, and, even were this necessity not absolute, if the by-laws show that there is one, it follows that this record, not the oral testimony of the members, or of bystanders, must prove their acts. Their acceptance of any deed, or their assent to any contract, if it be their own act, must appear on this record; if it be by agents, authorized for the purpose, the vote giving the authority must appear in like manner.

The 6th article of the fundamental rules directs, that " each cashier or treasurer, before he enters upon the duties of his office, shall be required to give bond, with two or more sureties, to the satisfaction of the directors, in a sum not less than 50,000 dollars, with a condition," &c.

As the bond is to be given before the cashier enters upon the duties of his office, it must be given before he can rightfully perform any official act; and it will be admitted, that the sureties to an official bond are responsible only for the official acts of the officer. This bond cannot be given till it is received, for they are different, and equally necessary parts of one and the same act; but, if it could, the law specially requires that it shall be " to the satisfaction of the directors." The " satisfaction" must be as to the sufficiency of the sureties, for the amount of the penalty is fixed by law. This is a subject on which the judgment of the directors must be exercised, and it can be exercised only at a regular meeting of a board, legally constituted. This must appear by the record. Any opinion given otherwise, is the opinion of individual members, but is not the corporate opinion of the board, is not a corporate act binding on the corporation, or of which the corporation can avail itself.

It appears to me, that the bond must be received and approved by the board, before the cashier can regularly perform any official act. This reception and approbation are

1827.

Bank of the
U. S.
v.
Dandridge.

required by the law which enables the corporation to act. They cannot be dispensed with. That they have been performed must be proved or presumed. If they have been performed, they are upon record; for the very act of performance places them upon record. This record, or an authentic copy of it, must, according to the rules of evidence be produced, that it may prove itself.

May its existence be presumed in this case?

The corporation, which claims this presumption, keeps the record, and is now in possession of it, if it exists. No rule of evidence is more familiar to the profession, than that a paper cannot be presumed under such circumstances.

I have stated the view which was taken by the Circuit Court of this case. I have only to add, that the law is now settled otherwise, perhaps to the advancement of public convenience. I acquiesce, as I ought, in the decision which has been made, though I could not concur in it.

JUDGMENT. This cause came on, &c. On consideration whereof, it is ORDERED and ADJUDGED, that there was error in the Circuit Court in rejecting the evidence offered by the plaintiffs in the first bill of exceptions stated, and not suffering the same to go to the jury in support of the issues joined in the case; and also, that there was error in the said Court in rejecting the evidence offered by the plaintiffs in the second bill of exceptions, and not suffering the same to go to the jury in support of the same issues; this Court being of opinion, that the evidence was admissible in favour of the plaintiffs, notwithstanding there was no record of any approval of the bond stated in said bills of exceptions by the board of directors of the bank aforesaid, and that the plaintiffs were at liberty to prove the fact of such approval by the said board, by presumptive evidence, in the same way and manner as such fact might be proved in the case of private persons not acting as a corporation, or as the agents of a corporation. And it is further ORDERED and ADJUDGED, that for the error aforesaid, the judgment of the said Circuit Court be, and hereby is, REVERSED and ANNULLED, and that the same be remanded to the said Circuit Court, with directions to award a *venire facias de novo*.