MARTIN, Appellant, v. ZELLERBACH et al., Respondents.

No. 936; December 20, 1866.

**Corporation.**—A Corporation may Ratify a Contract Made by Persons who, without authority, have assumed to represent it, and its power is, in that particular, coextensive with that of a natural person, unless by the charter the power is taken away or restricted to some particular formulary or mode.

**Corporation.**—A Ratification Need not in All Cases be Expressed; it may be implied, and the implication, which usually is based on conduct, may consist of acts or of omissions to act, or of both.

**Corporation—Ratification of Contract—Creditors.**—After an unauthorized act of a corporation, in contracting to convey, has been ratified by the stockholders, a creditor, who has become such after the ratification, may not claim that the contract was fraudulent and void as to creditors, and hence not enforceable, unless he proves that the ratification was had with a fraudulent intent; he cannot put upon the defendant the burden of proving the honesty of the ratification.

**Corporation—Ratification of Contract—Evidence.**—A plaintiff, whose contention rests on an act of a corporation alleged by him to be unauthorized, may rebut evidence put in to sustain the defense of ratification by proof that the ratification was with fraudulent intent, and may do so without first replying specially to the defense in the pleadings.

APPEAL from Fifteenth Judicial District, Nevada County.

Caldwell & Hubert for appellant; Belden & Niles for respondents.

SHAFTER, J.—Ejectment to recover the possession of certain ditch property situate in the county of Nevada. The defendants set up an equitable title to the ditch older than the legal title of the plaintiff, both titles being derived from the Eureka Lake Company, as a common source. The trial was by the court, and the judgment was in favor of the defendants. The appeal is from the judgment and from an order overruling the plaintiff's motion for a new trial. The appeal from the order is of no avail, for the evidence is not set forth in the statement, and the exceptions relied on are so imperfectly "explained" therein (Practice Act, sec. 190) that we cannot say that the rulings to which they relate are erroneous; and

the same remark is applicable to the appeal from the judgment in so far as it is based upon those exceptions. The result is that the only question before us is as to the law of the facts found, or agreed, and now relied on by the defendants as the basis of the equitable title asserted by them. This state of the record relieves us from the necessity of considering many of the questions discussed in the briefs of counsel.

The facts of the defendants' equity, as found by the court, are as follows: In 1859, and for several years before that time, the Eureka Lake Company was the owner and in possession of the ditch in controversy. At the same time another corporation, duly organized, called the "Miner's Ditch Company," owned certain other ditches in Nevada county. In the spring of 1859 a meeting of the stockholders of the Eureka Lake Company was held at Moore's Flat, their usual place of business, for the purpose of considering the project of uniting the property and business of the two corporations. All the stockholders were notified of the meeting and all the stock was represented, and it was agreed and determined by the stockholders, unanimously, that they would unite with the Miner's Ditch Company, on condition that the property of the two corporations should be thrown together and managed in common, and should be owned in the proportion of two shares to the Miner's Ditch and three shares to the Eureka Lake; and the president was authorized to communicate this overture to the Miner's Ditch Company. In May, 1859, there was a meeting of the Miner's Ditch Company, held for the express purpose of acting upon this proposition, at which meeting all the stock was represented, and the proposition was accepted by a formal vote.

In accordance with this agreement the two companies commenced acting in common and as one body on the 29th of June, 1859, and from that time until the fall of 1860 the property of both corporations was managed by common agents who had full possession and control of it all. Business was done in the joint names of the two companies. During this time large amounts of money were expended in improving the common property—over thirty-five thousand dollars on ditches of the Eureka Lake Company alone. This arrangement was only temporary, the intention being to effect finally a complete and legal union of the property and business of the two cor-

porations.   Accordingly, a meeting of the stockholders of the
Eureka Lake Company was regularly called and held in September, 1860, for the purpose of acting upon a proposal to
create a new corporation, to be composed of the members of
the two old ones, to which new corporation the property of
both the old ones should be conveyed; and at said meeting it
was determined that such new corporation should be organized
and that the Eureka Lake Company would convey to it all its
ditches and property upon the consideration that the Miner's
Ditch Company would do the same, and that stock in the new
corporation would be credited to the stockholders of the two
companies in the proportion agreed upon.   Similar action was
taken by the stockholders of the Miner's Ditch Company at a
meeting regularly called and held about the same time.   Immediately afterward, in the month of October, 1860, in accordance with these arrangements, a new corporation, called
the Eureka Lake Water Company, was duly organized by the
stockholders of the Eureka Lake Company and the Miner's
Ditch Company, and the latter company, on the 29th of October, 1860, conveyed all its part of the property to the new
corporation.

About this time the members of the Eureka Lake Company
were informed by counsel that their corporation had never
been perfected; that there was no such corporation as the
Eureka Lake Company in existence, and that the only way
in which they could convey the property was by a deed signed
by each member of the company in his individual capacity;
and in accordance with that advice a deed signed by the individual stockholders of the Eureka Lake Company was executed. October 25, 1860, purporting to convey all the said
property of the Eureka Lake Company to the Eureka Lake
Water Company, and from that time, viz., October 25, 1860,
to January, 1863, the new company had complete possession
and control of the property, claiming it as its own, no one
interfering with or disputing its title or possession, but no
deed of conveyance was ever given to the Eureka Lake Water
Company by the Eureka Lake Company as a corporation.

Immediately after the formation of the Eureka Lake Water
Company stock-books of that corporation were opened and
stock was issued to all the stockholders of the two old companies in the proportions agreed upon.   After the new com-

pany received possession it expended large sums in improving the property. It borrowed of defendants two hundred thousand dollars, a large portion of which was used in paying off liens on the property of the Eureka Lake Company, contracted before the Eureka Lake Water Company was organized. To secure this money so borrowed from the defendants the Eureka Lake Water Company gave to them a mortgage upon all the property, which mortgage provided that said defendants might receive and apply the profits and income of the property to the satisfaction of the said mortgage debt; and to more fully carry out this agreement, the Eureka Lake Water Company, on the 3d of July, 1863, gave to the defendants full possession and control of the property, and the defendants were in possession under this mortgage and agreement at the time of the alleged ouster as set forth in the complaint.

The general question is, whether these facts show a contract on the part of the Eureka Lake Company, as a corporation, to convey its ditch and water rights to the Eureka Lake Water Company, in consideration that the Miner's Ditch Company would make a like conveyance of its property to the same grantee; the new company being the instrument or agency through which the common purpose was to be carried into effect.

It may be admitted, for the purposes of argument, that the votes passed at the meetings of the stockholders of the Eureka Lake Company and the related votes of the stockholders of the Miner's Ditch Company were absolute nullities—the power of making contracts binding upon the corporations, respectively, being vested in the respective boards of trustees by the act under which the corporations were organized—leaving the question of whether the contract attempted to be made by the two sets of stockholders was or was not subsequently ratified by the respective corporations as the principal matter or point to be decided.

That a corporation may ratify a contract made by persons assuming to represent it without authority, and that its power is in that particular coextensive with that of natural persons, unless taken away by charter, or restricted by it to some particular formulary or mode, is admitted by both parties. That this power was exercised by the Miner's Ditch Company, at

least, is put beyond dispute by the finding that "the Miner's Ditch Company, on the 29th of October, 1860, conveyed all its part of the property to this new corporation—the Eureka Lake Water Company"; and we consider it to be equally clear that the Eureka Lake Company, though it never executed the contract made by its stockholders by giving a corporate deed, still ratified it in effect, and thereby made the contract its own.

A ratification may be either express or implied, and in the latter event the implication is usually, if not always, based upon conduct. The conduct may consist either in acts or in omissions to act, or it may lie in both. The facts found in the case at bar show a ratification in both forms by the Eureka Lake Company of the action of its stockholders.

It appears that the "arrangement" first attempted by the stockholders was a "temporary one—the intention being to effect finally a complete and legal union of the property and business of the two corporations." It is further found that "in accordance with this agreement the companies commenced acting together in common as one body, and on the 29th of June, 1859, the property of both corporations was managed by common agents who had the full possession and control of all. Business was done in the name of the Eureka Lake and Miner's Ditch Company. During this time large amounts of money were expended in improving the common property— over thirty-five thousand dollars being expended on the ditches of the Eureka Lake Company alone." It will be observed that the acts here enumerated were not, according to the findings, the acts of the stockholders, but of the companies, and, in the matter of quality, they were the very acts which the agreement of the stockholders contemplated or called for; and it is found in terms that these acts were performed by the respective companies, not outside of or irrespective of that agreement, but "in accordance with it."

The agreement "to unite the business and property" of the two companies—not their powers and franchises—was clearly a finality in the understanding of the respective stockholders, and the Eureka Lake Company, by voluntarily fulfilling its provisions in co-operation with the Miner's Ditch Company, must, in the absence of any finding to the contrary, be presumed to have ratified the contract as it was made or projected by the stockholders. The "arrangement" was "temporary"

only in this: it did not fully consummate on the instant the general purpose "to unite the property and business of the two companies"—such "complete and legal union" was postponed to a future day. At the second meeting of the stockholders held in September, 1860, the device of a new corporation to be called the Eureka Lake Water Company was hit upon as a means through which the "complete and legal union" to which the Eureka Lake Company was already committed might be consummated. After the creation of the new corporation the Eureka Lake Company recognized it in the relation or office to which it had been thus informally appointed; for it appears that the company took the property out of the possession of the "common agents" to whom it had been committed de bene esse, and "gave to the new company full possession of all the property in October, 1860; and that that company had the full possession and control of it to January, 1863, claiming it as its own, no one interfering with or disputing its title or possession. . . . . After the Eureka Lake Water Company received possession, it expended large sums of money in improving the property and in paying off liens contracted before that time by the Eureka Lake Company." From these facts, taken in connection, it is apparent that the Eureka Lake Company, in the first place, ratified the general arrangement made in 1859 by its stockholders with the stockholders of the Miner's Ditch Company for a union of the property and business of the two companies; and, in the second place, that it adopted and used the new company subsequently created as an instrument to accomplish that result. Under such circumstances, neither the Eureka Lake Company nor anyone standing in its shoes can be heard to say that it never brought itself into corporate relations with the contract made in its name and for its advantage by its stockholders. A decision to the contrary could be put upon no intelligible principle, nor could it, as we understand the cases, be vindicated on the ground of authority: Proprietors of the Canal Bridge v. Gordon, 1 Pick. (Mass.) 297, 11 Am. Dec. 170; Bank of United States v. Dandridge, 12 Wheat. (U. S.) 64, 6 L. Ed. 552; Dunn v. St. Andrews Church, 14 Johns. (N. Y.) 118. The case cited from the 1st of Pick. was like the present in every substantial particular.

Second. It is further insisted on the part of the appel-
lants, if the contract to convey is to be regarded as the con-
tract of the company, that it cannot be enforced, for the reason
that it was fraudulent and void as to creditors.

The point cannot be maintained for want of facts. The
court has not only not found the facts essential to the charge,
but has found two, at least, out of agreement, if not incom-
patible, with its truth, viz., that the plaintiff was not a cred-
itor at the date of the ratification of the contract by the
Eureka Lake Company, and that large sums of money were
raised and applied by the new company in payment of debts
of the old one. It is a mistake to suppose that it devolved
on the defendants to prove, as a part of their own case, that
the contract was not ratified by the Eureka Lake Company for
the purpose of defrauding its creditors. The burden of prov-
ing that it was so ratified was unquestionably upon the plain-
tiff. Nor, if he had the evidence at command, could he have
been embarrassed in using it at the trial on the ground that
he was excused under our system from the necessity of spe-
cially replying the fraud on the record. He was at full
liberty to make the reply ore tenus at the bar, and that instead
of being an embarrassment, was in the nature, at least, of a
positive advantage.

Third. It is further claimed for the appellant that the
contract to convey, treating it as the contract of the Eureka
Lake Company, was null and void, for the reason that the
company had neither the right nor the power to sell all of
its ditches and water rights.

Corporations aggregate have at common law an incidental
right to alien or dispose of their lands and chattels, unless
specially restrained by their charters or by statute (4 Co. Litt.
44a, 300c; 1 Sid. 161, note at the end of case; 1 Kyd, 108;
Reynolds v. Commissioners etc., 5 Ham. 166; 2 Kent's Com.
108), and though a corporation alien all its goods and posses-
sions, yet the corporation continues: 1 Com. Dig., tit. "Fran-
chise." By the fourth section of the act under which the
Eureka Lake Company was organized, it was authorized "to
purchase, hold, sell and convey such real and personal estate
as the purposes of the corporation should require." It will
be observed that no distinction is taken between real and per-
sonal estate, and that the jus disponendi as related to both

is coextensive with the "purposes" of the corporation.  It is apparent that the validity of the contract to convey, ratified by the Eureka Lake Company, cannot be dealt with by the court as a pure question of law.  The act of sale was not unlawful in itself, and whether the sale in the given instance transcended the limit put upon the power by the act is a question of fact upon which, if raised at the trial, the court must be presumed to have passed adversely to the plaintiff, inasmuch as no exception appears to have been taken to the findings under the act of 1861: Acts 1861, p. 589, sec. 2.

Further, it may well be questioned whether it is competent for the plaintiff to raise the objection.  The point of the objection is, that the corporation was guilty of a misuser of its franchise by overworking its admitted power to sell.  But such misuser would be a cause of forfeiture, and it would seem to be settled, though it is not necessary here to pass upon the question, that a cause of forfeiture can be taken advantage of by the government alone and in proceedings instituted for the purpose: Leazure v. Hillegas, 7 S. & R. 319; Baird v. Bank, 11 S. & R. 418; Goundie v. Northampton Water Co., 7 Barr (Pa.), 239.  The Banks v. Portiaux, 3 Rand. (Va.) 136, 15 Am. Dec. 706, was a bill for the specific performance of a contract for the purchase of lands made by an individual with the plaintiffs.  The defense set up was that the charters of the banks, after authorizing them to purchase, hold and enjoy lands and tenements, goods and chattels to a specified value, and sell and dispose of them, provided that the lands it should be lawful for them to hold should be only such as were for their immediate accommodation or acquired in satisfaction of debts.  The court of appeals decided "that though if, in purchasing the land in question the banks violated their charter, they might for that cause be dissolved by a proceeding at the suit of the commonwealth, yet that any conveyance made before dissolution would pass an indefeasible title to the purchaser; that the charter did not prohibit the purchase of real property by the banks, but only limited the extent to which they should be allowed to hold such property; and that the question whether they had exceeded their limits or not was not fit to be tried in the suit before them, at the instance of the party before them": Silver Lake Bank v. North, 4 Johns. Ch. (N. Y.) 370; Barrow v. Nashville & Charlotte Turnpike

Co., 9 Humph. (Tenn.) 304. It is undoubtedly true, however, that the official conduct of corporate officers may be reviewed and their acts affirmed or avoided at the suit of stockholders or creditors and the like; but under no circumstances can this be done at the instance of a stranger or of a subsequent purchaser, buying as the plaintiff must be presumed to have bought in this case, with notice of an equitable title already vested in a third person. A subsequent purchaser, under such circumstances, holds subject to the equitable right.

Fourth. We have stated that the "errors of law occurring at the trial" are so imperfectly developed in the statement that we cannot get behind the rulings complained of. To this, however, there may be a single exception. It appears that one Creegan had testified on the part of the defendants to the contract agreed upon at the meeting of the stockholders of the Eureka Lake Company in September, 1860, and that for the purpose of corroborating the evidence of the witness as to the scope and character of that contract, the defendants offered in evidence a deed subsequently executed to the Eureka Lake Water Company of all the property belonging to the old company, which deed was signed by the stockholders and by its trustees as such. It was not on its face the deed of the company. The deed was objected to but was received, and the plaintiff excepted.

The defendants relied upon a subsequent ratification by the company of the unauthorized contract of its stockholders, and the instrument was admissible for the purpose of proving the existence and character of the contract so subsequently ratified.

All the other questions raised in the discussions have not been considered, but there are none of them of sufficient interest to require special notice.

Judgment affirmed.

We concur: Currey, C. J.; Rhodes, J.; Sawyer, J.; Sanderson, J.