## COMMONWEALTH *vs.* CHARLES E. CARR.

Bristol.    Oct. 26. — Nov. 24, 1886.    DEVENS & W. ALLEN, JJ., absent.

At the trial of an indictment for obstructing a public way in a town, in 1885, the government introduced evidence of the laying out of the way by the selectmen in 1853, and its acceptance by the town. *Held*, that it was not necessary to offer direct evidence that the laying out of the way was duly filed in the town clerk's office.

A parol license by a town to a person to place a gate on a public way does not include an authority to keep the gate locked, with the key in his possession.

If, at the trial of an indictment, the jury fail to agree upon a special issue submitted to them, and, without objection, their general verdict is taken, the defendant has no ground of exception to the course of the judge in receiving the verdict.

INDICTMENT for obstructing a certain public way in Berkley, on January 1, 1885, by placing a fence and gate across the same. Trial in the Superior Court, before *Barker*, J., who allowed a bill of exceptions, in substance as follows:

The way in question was a town way located in that part of Berkley known as Assonet Neck.    The government put in evidence a transcript from the records of the town, showing that, in 1853, George Pierce and others petitioned the selectmen to lay out a road " beginning at a termination of the Assonet Neck road (so called) in Berkley, and leading in a southerly direction through lands of Darius Phillips and George Pierce to a heap of stones on the beach of the river near the dwelling-house of George Pierce ; " that, on February 10, 1853, the selectmen reported to the town that they had laid out, as a town way, the road petitioned for, as follows : " Beginning at a stake and stones at the termination of the Assonet Neck road (so called) and on the north line of Darius Phillips, Jr. land, thence on said Phillips land south fourteen and a half degrees west thirty-three rods to land of Darius Phillips a stake and stone, thence on his land south thirteen and three fourths degrees west seventy-five rods to a stake and stones, thence south twenty-seven and a half degrees west thirteen rods to a stake and stones on the west side of the orchard wall, thence on his land south forty degrees west twenty-four rods to land of George Pierce, and thence continuing the same course on said Pierce's land twenty-five rods to

a stake and stones, being the end of said road;" that, in the warrant for a town-meeting on February 21, 1853, was the following article: "Article 7. To see if the town will accept the report of the selectmen on laying out a road in Assonet Neck (so called) as petitioned for by George Pierce and others, and establish the same;" and that, at a meeting held in pursuance of said warrant, it was "Voted, that the town accept of the doings of the selectmen in laying out the road mentioned in the 7th article of the warrant."

The town clerk testified that the town had no by-laws; that none were on the town records; that, if there were any, they were those which were framed at the original organization of the town, in 1735; and that he was not able to find the original report of the selectmen on the laying out of this road.

There was evidence showing that, soon after the town meeting in 1853, Pierce built a bridge across the road, about ten rods north of the house; that he fenced along certain portions of the road south of his house, and put up bars on or near the south end of the road, as defined in the report of the selectmen. There was conflicting testimony as to whether the town authorities had, after the location of the road, entered upon or done any work upon the portion of the road extending from said bridge to the southern terminus; the government contending that it had, and the defendant that it had not. Evidence was introduced by the government to the effect that this part of the road, as well as the other part, had been used more or less as a public way by foot passengers and teams ever since its location; and that the use had increased in late years. It was admitted that the town had done nothing in the way of repairing the sections of the road running southerly from the bridge since the original work, if any, was done, shortly after the location; that the road had been for many years in a rough and poor condition; that its main use was in the warm weather, when persons drove or walked over it for purposes of pleasure, and to dig clams on the shore beyond; that, in order to reach the shore from the end of the road, they were required to pass over a part of the defendant's farm which lay between the shore and the southerly terminus of the road.

In 1853, Pierce applied to the selectmen for leave to place a gate somewhere over the road nearer his house than the bars were, and was granted a parol license to place the gate on the road " where he pleased; where it was most convenient." This license never has been revoked. A gate was built by Pierce shortly after, and was maintained by him for about two years, when he moved it about two rods north, and it has since been in the same place, and maintained in the same form. The defendant purchased Pierce's farm in 1881, and found the gate where it has since been maintained; the gate, as built originally by Pierce and maintained by the defendant, being about twelve rods north from the southerly terminus of the road as laid out by the town in 1853. It was proved by the government, and admitted by the defendant, that, at divers times in 1885, he had kept the gate locked, and had the key in his possession. The government introduced evidence tending to show that he had charged persons for opening the gate, and refused so to do, or to allow them to go to the shore, unless they paid him for opening the gate, or for the sea-weed taken from his farm. There was conflicting testimony as to whether the defendant had charged persons for opening the gate or for going on his farm; the defendant contending that he had charged only for the latter.

There was evidence that persons had driven up to the gate to go farther on to the shore, but, finding the gate locked, had turned back. The defendant testified that he had been greatly annoyed by persons trespassing on his farm, especially on Sundays, and had suffered losses from their depredations. Evidence was introduced on both sides as to the identification of the way laid out in 1853 with the way which was alleged to have been obstructed by the defendant; and as to whether the way was laid out of the width defined in the location. It appeared that the "stake and stones" mentioned in the location had all disappeared; nor did any witness remember that any such existed at the time the way was laid out; but there was testimony as to lines of division between the several farms and estates mentioned in the location.

It was also shown that the gate had been maintained since 1868 with the knowledge of the selectmen.

The defendant asked the judge to rule as follows: "1. The road in question, which it is alleged was obstructed by the defendant, was not legally established at the town meeting held in Berkley in February, 1853; and the alleged location is invalid and void, for the reason that there is no evidence that the said laying out was filed in the office of the town clerk in conformity with law; and for the additional reason, that the report of the selectmen and their survey were insufficient and uncertain, and did not properly define the said road. 2. If a license was granted by the selectmen for the placing of a gate on or near the place where a gate was maintained by the defendant, and such license was never revoked, and if such gate was standing when the defendant bought, having been put there by his grantor, the defendant should not be convicted."

The judge declined so to rule, but instructed the jury that it was necessary to the validity of a town way that the report thereof should be filed by the selectmen with the town clerk at least seven days before the town meeting at which the question of acceptance was voted upon, but that, in this case, as there was nothing in the evidence inconsistent with the seasonable filing of the report, such seasonable filing might be presumed; that a license from the selectmen to maintain a gate across the way would justify the defendant in keeping up such gate, but not in locking the gate, and thereby preventing persons from passing and travelling along the way without his consent; and that, if the defendant had locked the gate, and thereby prevented persons from passing along the way, such license would not be a justification of such acts.

The judge also submitted the following special issue to the jury: "Did the town of Berkley after its annual meeting of 1853 enter upon and work any portion of the town way (which at said meeting it voted to accept) between the bridge and the southern terminus of the road?"

The jury were unable to agree upon the special issue submitted to them; and, without objection, the verdict of the jury was taken, which was "guilty." The defendant alleged exceptions.

*M. Reed*, for the defendant.

*E. J. Sherman*, Attorney General, for the Commonwealth.

C. ALLEN, J. It was not necessary to offer direct evidence that the laying out of the way was duly filed in the town clerk's office. The action of the selectmen and of the town presuppose that this had been done, and warrant an inference of the fact. See *Blossom* v. *Cannon,* 14 Mass. 177 ; *Wallace* v. *Townsend Parish,* 109 Mass. 263 ; *United States Bank* v. *Dandridge,* 12 Wheat. 64, 70 ; *Cornett* v. *Williams,* 20 Wall. 226, 250 ; Steph. Ev. (Am. ed.) 187, 271 ; *Williams* v. *Eyton,* 4 H. & N. 357.

The license to the defendant to place a gate on the road could not include an authority to keep the gate locked, with the key in his own possession, which would be equivalent to stopping up the road.

It was not essential that the jury should agree upon the special issue submitted to them ; and no objection was taken at the time to the course of the judge in receiving the verdict.

*Exceptions overruled.*