Charlotte J. Forshew v. Commissioner.
Forshew v. Commissioner
Docket No. 110687.
United States Tax Court
1943 Tax Ct. Memo LEXIS 228; 2 T.C.M. (CCH) 337; T.C.M. (RIA) 43310; June 28, 1943
*228 M. L. Seidman, C.P.A., 80 Broad St., New York City, for the petitioner. E. E. Strickland, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: Respondent has determined a deficiency in income tax of petitioner in the sum of $927 for the calendar year 1939. The issue is whether the gain of $17,950.23 realized by petitioner upon receipt from a corporation of a payment in redemption of stock therein owned by her, is taxable in full or only to the extent of 50 per cent as a long-term gain under section 115 (c) of the Internal Revenue Code. [1]
*229 Findings of Fact Petitioner is a resident of Brooklyn, New York. Her return for the calendar year 1939 was filed with the collector for the First Collection District of New York. On October 23, 1939, Jakobson and Peterson, Inc., a New York corporation, had outstanding 2,689 shares of capital stock of a par value of $100 per share which were held as follows: Stockholder
No. Shares
Total Shares
%
Irvin D. Jakobson
500
Edna A. Hossfeld
500
Estate of Charlotte Peterson
500
F. E. Grauwiller
250
Louis F. Peterson
189
1,939
72
Genevieve J. Knemeyer
166 6/9
Ida Waller
166 6/9
Charlotte F. Jacobus
125
Charlotte J. Forshew
97 5/9
Gwendolyn J. Welfley
97 5/9
Frank S. Jacobus
96 5/9
750
28
Total
2,689
100
The 97 5/9 shares of stock in the corporation owned by petitioner had been her property for some years. From the date of its organization the corporation was engaged in the business of shipbuilding and repairs. Its plant and office were located at the foot of 16th Avenue in Brooklyn. When the construction of a new parkway from Fort Hamilton to Coney Island was begun, the City of New York acquired the greater portion of the corporation's property by condemnation. *230 Title was taken in 1938 and the sum of $320,000 was awarded for the land and consequential damages. In the Fall of 1938 a firm of attorneys was engaged by the corporation to prepare plans for liquidation of the corporation and to make a study of the tax problems incident thereto. As a result, a memorandum was submitted by the attorneys setting out four plans. Plan No. 1 was one under which, if certain of the stockholders desired to carry on the corporation and acquire a new location, there would be a partial liquidation through the acquisition by the corporation of the stock of those stockholders wishing to liquidate their investments. Plan No. 2 covered the condition under which the corporation would be continued and the stock of the retiring stockholders would be purchased from them by the continuing stockholders. Plan No. 3 contemplated the complete liquidation of the corporation in December 1938 under section 112 (b) (7) of the Revenue Act of 1938. Plan No. 4 contemplated the complete liquidation of the corporation after December 1938 within the period required under section 115 (c) of the Revenue Act of 1938 in order that the gains to the stockholders in the liquidation distributions *231 would be taxable to the stockholders as long-term capital gains. At a meeting of the board of directors of the corporation held on December 19, 1938, each member of the board was presented with a copy of the memorandum from the attorneys above mentioned with the request that they study it in order that the suggestions might be discussed at the next meeting. The next meeting of the board of directors of the corporation was on January 5, 1939 and Irving D. Jakobson, president of the corporation, stated at such meeting that he proposed to purchase the stock of the corporation and would submit a proposal notifying each stockholder of the amount he was willing to pay. On April 3, 1939, Jakobson wrote William Knemeyer, one of the directors of the corporation, forwarding him a copy of an audit report computing a value for the capital stock of the corporation at $154.59 per share as of December 31, 1938. He further advised that he would be unable to carry out his plan for the purchase of the stock of other stockholders and that since all of the business of the corporation would be terminated by June 30, 1939, he suggested, in effect, as the most feasible proposition that they begin complete *232 liquidation proceedings at that time. At a meeting of the board of directors of the corporation on April 20, 1939, Jakobson made an announcement of his determination not to purchase the corporation. A committee of three was thereupon appointed to make a survey of the properties of the corporation not included in the condemnation proceeding and to set prices on all of these items. Following this, on May 23, 1939, another meeting of the board of directors of the corporation was held at which an inventory of the items of property of the corporation was submitted by the committee appointed, and authority was given to the committee to sell the machinery, buildings and equipment at the appraised prices. At a meeting held on June 8, 1939, an offer by Jakobson was received and accepted to purchase certain of the corporation's assets. The price to be paid by him was to be offset against the liquidating payments which he was to receive from the corporation. Another director of the corporation, Frederick E. Grauwiller, also purchased certain of the assets of the corporation and the amount due from him and that due from Jakobson were offset against their shares of the distributions to be made *233 in liquidation. As various items of machinery, etc., were disposed of between April and October 1939 the committee appointed to value and sell these assets made reports to the directors with respect to the terms of the sales. The minority stockholders of the corporation who, as above indicated, owned 28 per cent of the corporation stock had equal representation with the majority stockholders on the board of directors, each group being represented by three directors. The minority had been able to secure this representation due to the fact that they or certain of them were owners of a mortgage on the corporation's dry dock property. Over a considerable period of time there had been discontent and dissension between the majority and minority interests. In June 1939 sufficient funds were secured through sale of the corporation's assets by the special committee of the board of directors to pay off the mortgage and as soon as this was done the friction between the majority and minority interests in the corporation came to a head. R. G. Waller, who represented the minority stockholders on the committee engaged in disposing of the corporate assets, in his investigation of the accounts receivable *234 of the corporation, discovered that certain of the majority stockholders had been having the corporation perform services for them, in connection with other businesses which they owned and operated, under conditions or at terms which were disadvantageous to the corporation. It was estimated that these individuals among the majority shareholders were indebted to the corporation to the extent of $20,000 and the minority insisted that this amount be paid into the corporation before the liquidation was completed. An offer of $3,000 was made in answer to this demand which was refused by the minority interest. Repeated attempts were made to adjust the differences but without result. The condemnation award due from the City of New York was available for collection and the minority stockholders insisted that unless the adjustment demanded by them should be made they would not co-operate in collecting this award which could only be done through action by the board of directors upon which they held equal representation with the majority. Under these conditions the majority stockholders, controlling 72 per cent of the stock voting power, issued a call on September 14, 1939 for a special meeting *235 of stockholders to be held on September 26, 1939 for the stated purpose of increasing the number of directors from 6 to 9 and thereupon take action to dissolve the corporation. This action was taken so as to give the majority interest an opportunity to secure the control of the board of directors in which event they could then proceed to take the necessary action to secure the payment of the award by the City of New York even if opposed by the 3 members of the board of directors representing the minority interest. The interested parties finally got together in an attempt to work out the differences and the minority demanded immediate payment for their stock interest in the liquidation at $200 per share. Finally, after negotiation, the amount of $194 per share was agreed upon and to carry out the agreement the owners of the minority stock offered to sell their stock to the corporation at this figure. At a directors' meeting on October 24, 1939 this offer was accepted and the minority directors thereupon reigned as such, this action having been agreed to as a condition of the payment. On the same day, within a few minutes after this arrangement was effected and action taken, the award *236 was collected from the City of New York and payment of the amount of $194 per share due the minority stockholders was made. On October 27, 1939, the board of directors accepted the resignations of the 3 minority $ members of the board, authorized the retirement of the 750 shares of stock acquired from the minority stockholders as above set out, and further resolved that since the company had ceased to carry on the business for which it was organized and all of the stockholders had signed a certificate of dissolution, a liquidating dividend of $100 per share be declared and paid on the remaining shares of stock issued and outstanding. On October 31, 1939, the certificate of dissolution of the corporation was filed with the Secretary of State at Albany, New York, and on the same date a certificate was issued by the Secretary of State declaring the corporation dissolved. On December 13, 1939, there was held a special meeting of the stockholders of the corporation dissolved six weeks before and a formal resolution was entered in the corporate minutes certifying to the intention for a complete liquidation of the corporation under section 115 of the Revenue Act of 1938. Thereafter a series *237 of additional distributions were made to the majority stockholders, the final distribution of the last remaining assets of the corporation being made on December 29, 1942. Petitioner realized a gain of $17,950.23 in the disposition by her of her 97 5/9 shares of stock in the corporation and in her return for 1939 reported it as a long-term capital gain. In determining the deficiency respondent treated the gain as a short-term capital gain as resulting from a distribution in partial liquidation of the corporation. Prior to October 24, 1939 this corporation, through its directors, determined upon its complete liquidation and the transaction on that date, in which corporate assets in the amount of $194 for each share of stock held by the minority interest were paid to the owners of such stock, was an incident of such liquidation. Opinion Petitioner contends that the payment to her and to the other minority stockholders in the corporation was merely one of a series of distributions in the complete liquidation of the corporation. It is argued that the fact that this payment per share was in a different amount from that distributed in liquidation 48 hours later on the remaining shares *238 of stock belonging to the majority stockholders, does not affect that conclusion since this difference was due merely to the dispute between these two factions in the course of the complete liquidation being then effected, and the insistence by the minority that their stock be liquidated in full then because of their distrust of the majority stockholders in their handling of the liquidation in progress. Respondent contends that at the time of the distribution of $194 per share to the minority stockholders, no plan for complete liquidation of the corporation had been determined upon by the board of directors and that this was consequently a partial liquidation. It appears to be his theory that within 48 hours following this conceded liquidating payment the corporation for the first time decided upon complete liquidation and that the distributions subsequent to that date are the only ones made under a plan for complete liquidation. We have found as an ultimate fact that the distribution to petitioner and other minority stockholders at the rate of $194 per share was under a plan for complete liquidation of the corporation determined upon prior to the date of that payment. That finding *239 decides the issue here. We think that finding is amply supported by the record. It is true that the corporate minutes did not formally record a decision for a complete liquidation until after the time of the payment in question. That fact, however, does not preclude proof that such determination had been made and a plan of complete liquidation determined upon prior to that time. The question is whether or not such a plan had in fact been adopted by the corporation and not merely whether it had been evidenced in the corporate minutes. Handley v. Stutz, 139 U.S. 417, 35 L. Ed. 227, 11 S. Ct. 530; Bank of United States v. Dandridge, 25 U.S. 64, 6 L. Ed. 552, 12 Wheat. 64; Young v. United States Mortgage & Trust Co., 214 N.Y. 279; 108 N.E. 418. That the intent for complete liquidation of the corporation was evidenced by a corporate resolution subsequent to the transaction in question does not disprove nor contradict the fact that the actual adoption of the plan of liquidation by the board of directors preceded that date. Beyond that there are many circumstances here which indicate that a plan of complete liquidation had *240 been finally determined upon by the directors and was being prosecuted actively long before the particular distribution in dispute here. The testimony of one of the officers of the corporation, who was also a director therein, is that the plan had been finally agreed upon and was being carried out before that time. His testimony is supported by the fact that the business of the corporation had ceased, a committee had been appointed and had been actively engaged for some time in selling all of the assets of the corporation not condemned by the City of New York and that the alternative plan of a purchase of the interests of all other stockholders by Jakobson had been abandoned. If it is a fact that a plan for complete liquidation had been adopted and was being executed prior to the distribution to the petitioner and such distribution was made in effecting that liquidation, as we have found, then this fact must control. As was said by the court in Buhl v. Kavanagh, 118 F.2d 315: It is well settled, and we know of no contrary authority, that in matters of taxation, substance, rather than the form, of a transaction will be regarded. United States v. Phellis, 257 U.S. 156, 66 L. Ed. 180, 42 S. Ct. 63. *241 In applying this rule, if the court finds a transaction is not what it appears to be, actualities only will be considered. Decision will be entered for the petitioner. Footnotes
1. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (c) Distributions in liquidation. - ↩ Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117, the gain so recognized shall be considered as a short-term capital gain, except in the case of amounts distributed in complete liquidation. For the purpose of the preceding sentence, "complete liquidation" includes any one of a series of distributions made by a corporation in complete cancellation or redemption of all of its stock in accordance with a bona fide plan of liquidation and under which the transfer of the property under the liquidation is to be completed within a time specified in the plan, not exceeding, from the close of the taxable year during which is made the first of the series of distributions under the plan, (1) three years, if the first of such series of distributions is made in a taxable year beginning after December 31, 1937, or (2) two years, if the first of such series of distributions was made in a taxable year beginning before January 1, 1938. * * *